### In re The BENNETT FUNDING GROUP, INC., Debtors.

### Richard C. Breeden, Plaintiff,

### v.

### L.I. Bridge Fund, LLC and European American Bank, Defendants.

### Bankruptcy No. 96–61376.
### Adversary No. 96–70280.

United States Bankruptcy Court, N.D. New York.

Feb. 22, 1999.

Simpson, Thacher & Bartlett (William T. Russell, of counsel), New York City, for Trustee.

Berkman, Henoch, Peterson, Peddy (Ronald M. Terenzi, of counsel), Garden City, for L.I. Bridge Fund, LLC.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Richard C. Breeden ("Trustee"), as Chapter 11 Trustee of Bennett Manage- ment and Development Corp. ("BMDC") and of the substantively consolidated estates of The Funding Group (the "Consolidated Estates"),[1] has commenced this adversary proceeding against the defendant, L.I. Bridge Fund, L.L.C. ("L.I. Bridge"), pursuant to §§ 548 and 544(b) of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1330 ("Code").

At issue is an eleventh-hour transaction closed on March 21, 1996, in which BMDC conveyed a warrant for 320,000 shares of stock in AmeriData Technologies, Inc. ("AmeriData") to L.I. Bridge in exchange for $350,000 in cash. Eight days after the closing, BMDC filed for bankruptcy, and less than four months later, L.I. Bridge exercised the AmeriData warrant and sold the underlying stock for approximately $2.14 million, a sum which is currently held in escrow by co-defendant European American Bank ("EAB") pending the outcome of this litigation.

In his adversary complaint, filed with this Court on September 27, 1996, and amended on October 7, 1996, the Trustee seeks to avoid the sale of the AmeriData warrant as an actual and constructive fraudulent transfer under both federal and state law, and additionally seeks turnover of the funds held in escrow.[2] In support of his cause of action, the Trustee has attempted to prove that $350,000 was a grossly inadequate price for the AmeriData warrants at the time of the transaction, that BMDC was insolvent at the time of the sale, and that BMDC sold the warrant with the actual intent to hinder, delay, or defraud its creditors.

While L.I. Bridge has stipulated to the fact of BMDC's insolvency, it asserts that the $350,000 it paid was a reasonable price

---

1. By an order of this Court dated July 25, 1997, the Chapter 11 estate of BMDC has been substantively consolidated with that of the Bennett Funding Group and six other interrelated corporations (collectively, the "Bennett companies").

2. The Trustee's complaint also sought to avoid an unrelated pre-petition transaction as a preferential transfer under Code § 547. On October 30, 1997, the Court granted the Trustee summary judgment on his preference claim, while denying the Trustee's motion and L.I. Bridge's cross motion for summary judgment on all causes of action arising out of the AmeriData sale.

for the AmeriData warrants at the time of the transaction, and that the Trustee has failed to prove that BMDC acted with fraudulent intent. Alternately, L.I. Bridge argues that if the sale transaction is avoidable, it should be allowed to retain $350,000 of the escrowed funds as a good-faith purchaser pursuant to Code § 548(c).

The Trustee's fraudulent conveyance causes of action were tried before this Court on October 1 and October 16, 1998, after which each party was given the opportunity to submit a post-trial memorandum of law. This adversary proceeding was then submitted for decision on January 19, 1999.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this core adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a), (b)(1), and (b)(2)(H).

## FINDINGS OF FACT

The principal facts relevant to this adversary proceeding are not in dispute. L.I. Bridge is an investment company created in early 1996 by Neil Wager ("Wager"), a fund manager with over three decades of professional financial experience. From its inception, L.I. Bridge was intended to serve as a supplemental investment vehicle for Wager's already-extensive financial dealings with the Bennett companies, BMDC, and Patrick R. Bennett ("Bennett"), the dominant officer of BMDC. Apart from a pre-petition loan to the Bennett companies that was the subject of a previous round of litigation in this adversary proceeding, *see Breeden v. L.I. Bridge Fund (In re The Bennett Funding Group)*, Adv. No. 96–70280A (October 30, 1997) (granting the Trustee's motion for partial summary judgment), it appears that L.I. Bridge's only business activity has been its purchase of the AmeriData warrant and the ensuing litigation.

Wager's dealings with AmeriData go back to at least 1994, when he helped arrange a private debt offering for AmeriData (then known as Sage Technologies, Inc.) that was partially funded by BMDC. As part of the transaction, AmeriData issued to BMDC a warrant to purchase 320,000 shares of AmeriData common stock at a strike price of $13.60 per share (the "Warrant"), which was set to expire on June 30, 1998.[3] In 1995, AmeriData amended the Warrant, extending its term until June, 2000 and lowering the strike price to $9.30 per share. While the Warrant was initially a restricted security issued through a private placement, and consequently not freely tradeable on the public market, the restriction was removed pursuant to a Form S–3 Registration Statement filed by AmeriData with the Securities and Exchange Commission on December 23, 1994. Although the Warrant was thus fully transferrable by 1996, the terms of the Warrant required that all transfers be registered with AmeriData.

BMDC held the AmeriData Warrant until March 21, 1996, when it was conveyed to L.I. Bridge in the transaction presently at issue. According to Wager's testimony, discussions about the sale began in February, 1996, after he learned that BMDC was considering an offer to sell the Warrant to Royce Securities ("Royce") for $350,000.[4] Wager telephoned Bennett to discuss this sale, at which time Bennett allegedly offered the Warrant to Wager at the same price as had been offered by Royce. A

---

**3.** A warrant is a financial instrument that gives the holder the right, but not the obligation, to purchase a specified amount of the issuer's common stock at a specified price (the "strike price") within a specified time period. A key feature of any warrant is that it offers asymmetric payoffs, since the holder will profit from any rise in the stock price above the strike price, while losses are limited

to the price paid for the warrant itself. *See* Testimony of Professor William Silber at 61 (October 1, 1998).

**4.** The Court notes that Wager's testimony concerning Royce is inadmissible hearsay to the extent that it purports to prove that such an offer was actually made.

verbal agreement on these terms was finalized on February 14, 1996, after which Wager instructed his attorney, Kenneth Cohen ("Cohen"), to prepare a written sale contract. Wager stated that $350,000 was the only price ever discussed by either party during these negotiations.

While Wager was the only witness who testified about the negotiations leading up to the sale, his account is contradicted in some respects by the documentary evidence introduced at trial. Among this evidence is the unsigned draft of a sales agreement prepared by Cohen and dated March 21, 1996, in which BMDC purports to sell the Warrant for $480,000 to N.W. Investors II, L.L.C. ("N.W. Investors"), another investment fund managed by Wager. In a 1996 deposition, portions of which were read into evidence at trial, Cohen stated that he would not have entered any dollar figure on the draft contract without specific instructions from Wager. In addition, Wager's testimony that a final verbal agreement was reached in mid-February is contradicted by Cohen's deposition testimony that no work was done on any AmeriData transaction before March 19, 1996.

As it happened, the sale of the Warrant was closed just as the stock price of AmeriData peaked at a four-month high. After trading as high as 13⅝ dollars per share in the summer of 1995, AmeriData shares had slipped below 9 in early January 1996, a price well below the strike price of BMDC's Warrant. By February 14, 1996, the date on which Wager and Bennett allegedly reached an oral agreement to sell the Warrant, AmeriData stock was quoted at 9⅝, and it had further climbed to 11⅛ by March 19, 1996, the date on which Cohen drafted the N.W. Investors sale agreement. AmeriData's stock price remained at 11⅛ on the closing date of March 21, 1996, giving the Warrant for 320,000 shares an intrinsic value of $ 584,000, disregarding the effects of any stock dilution.

BMDC filed for bankruptcy on March 29, 1996. Although a subsequent audit revealed that BMDC was hopelessly insolvent throughout the first months of 1996, Wager insisted that he was unaware of the Bennett companies' precarious financial position, as evidenced by the fact that he and his family had approximately $3.5 million of their own funds invested in various Bennett projects at the time of the bankruptcies. At a minimum, however, a few warning signs of BMDC's troubles should have been evident to Wager by March, 1996. In late 1995, checks issued by the Bennett companies to investors in one of Wager's funds were returned for insufficient funds, and in early 1996 Wager learned that the Bennetts were delaying payment on certain other obligations. Wager also knew of a pending SEC investigation of BMDC, although he stated that he then believed it to be nothing more serious than a routine compliance check. Lastly, Wager was aware that the Bennett companies were experiencing severe cash-flow problems, which resulted in Bennett calling on L.I. Bridge for a two-week, $1.2 million loan in February 1996. While Wager admitted that he never asked what the loan was needed for, he claimed to be familiar with the annual financial reports of the Bennett companies and stated that he saw no cause for alarm.

On May 20, 1996, General Electric Capital Corporation ("G.E. Capital") announced a tender offer for all issued and outstanding AmeriData shares, with a tender offer of $16.00 per share. Pursuant to an agreement between the Trustee and L.I. Bridge, dated July 15, 1996 (the "Escrow Agreement"), L.I. Bridge exercised the Warrant and immediately tendered its shares to G.E. Capital. The difference between the total tender price and the strike price came to $2,144,000, which was then placed in an interest-bearing escrow account with EAB to await the determination of this adversary proceeding.

At trial, the Trustee introduced expert testimony on the value of the AmeriData Warrant as of the dates relevant to the transaction from William Silber, a profes-

sor of finance at New York University and a leading academic authority on the valuation of financial instruments. Silber concluded that the AmeriData Warrant was worth between $1 million and $1.2 million on February 16, 1996, and worth between $1.3 million and $1.4 million on March 21, 1996. Silber based his findings on the "binomial" model of option valuation, which he described as a generally accepted pricing method widely used by professional options traders. Silber's calculations assumed, contrary to fact, that the AmeriData Warrant was still a restricted security at the time of the transaction; without this restriction, Silber noted that the market value of the Warrant would have been considerably higher on both dates. Silber also stated that although the underlying stock of AmeriData was somewhat thinly traded, any large investment bank would have been willing and able to make an immediate bid on the Warrant.

Expert testimony for L.I. Bridge was presented by Andrew Beaurline, a member of the corporate finance department of Sucsy, Fisher & Co., a Chicago-based investment bank. Although Beaurline also employed the binomial model in valuing the AmeriData Warrant, his conclusions were considerably different from those of Silber: according to Beaurline, the Warrant was worth between $300,000 and $400,000 in mid-February, 1996, while its value on March 21, 1996 was between $450,000 and $600,000. Like Silber, Beaurline assumed that the Warrant was a restricted security, although his calculations employed a discount for illiquidity that was approximately double that used by Silber. In addition, Beaurline appears to have obtained his final result by taking a weighted average of his binomial model result, the actual sale price, the amount of the alleged Royce offer, and the Warrant's "intrinisic value," defined as the difference

between the stock price on the date of the transaction and the strike price, multiplied by the number of shares. None of these additional factors were considered by Silber.[5] Had he considered only the output of the binomial model, Beaurline testified that the resulting valuation of the Warrant would have been $749,000 as of February 15, 1996, and $880,000 as of March 21, 1996.

## CONCLUSIONS OF LAW

### I. CODE § 548(a)(1)(B)

■■■ A transaction may be avoided as a constructively fraudulent transfer under federal bankruptcy law if it is proved that (1) the debtor had an interest in the property transferred; (2) the transfer occurred within one year of the petition date; (3) the debtor was insolvent at the time of the transfer or became insolvent as result of it; and (4) the debtor received less than a reasonably equivalent value in exchange for the transfer. See Code § 548(a)(1)(B); Mellon Bank v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.), 92 F.3d 139, 144 (3d Cir. 1996). As the party seeking to avoid the transaction, the Trustee bears the burden of proof by a preponderance of the evidence on on all four elements. See Durso Supermarkets, Inc. v. D'Urso (In re Durso Supermarkets, Inc.), 193 B.R. 682, 696 (Bankr.S.D.N.Y.1996). In the present case, the first three elements are undisputed.

■■■ In determining whether a transfer has been made for reasonably equivalent value, the Court must look to events as they existed on the date of the transfer. See Cooper v. Ashley Communications (In re Morris Communications NC, Inc.), 914 F.2d 458, 466 (4th Cir.1990). The date of the transfer, in turn, is determined as the

5. In his criticism of the report prepared by Beaurline, Silber noted that intrinsic value is a poor indicator of a warrant's value, since the market value of a warrant will always exceed its intrinsic value. Silber also testified

that he had no basis to believe that the alleged Royce offer was credible, and questioned the appropriateness of including the transaction actually under consideration in Beaurline's analysis of fair market value.

date on which the transfer would have become perfected against a subsequent bona fide purchaser under applicable state law. *See* Code § 548(d)(1); *Sandoz v. Bennett (In re Emerald Oil Co.)*, 807 F.2d 1234, 1237 (5th Cir.1987).

■ Applying this standard, it is clear that no transfer in the sense of Code § 548(a)(1) took place until at least March 21, 1996, even if the Court credits Wager's otherwise unbelievable testimony about the existence of an oral agreement supposedly finalized an entire month before the written contract was drafted. Under New York law, warrants evidencing a right to buy the stock of the issuer are treated as investment securities, and accordingly are governed by Article 8 of the New York Uniform Commercial Code ("N.Y.U.C.C."). *See* N.Y.U.C.C. § 8–102 cmt. 2 (McKinney 1990); *Art–Camera–Pix, Inc. v. Cinecom Corp.*, 64 Misc.2d 764, 767, 315 N.Y.S.2d 991, 994 (N.Y.Sup.Ct.1970). As noted above, the Warrant could only be exercised by a transferee whose purchase was registered with AmeriData; under Article 8, Wager's right to the Warrants would not have defeated those of a bona fide purchaser until the Warrant was actually delivered and registered. *See* N.Y.U.C.C. § 8–302 (bona fide purchaser acquires all rights of a purchaser upon registration). Moreover, it appears that the alleged oral contract between Wager and Bennett would have been unenforceable in any case under the former Article 8 Statute of Frauds, which in 1996 was still the law of New York. *See Mortimer B. Burnside & Co. v. Havener Securities Corp.*, 25 A.D.2d 373, 377, 269 N.Y.S.2d 724, 726 (N.Y.App.Div. 1st Dept.1966); N.Y.U.C.C. § 8–319(a) (repealed).[6]

■ According to the testimony of L.I. Bridge's own expert, the Warrant was worth a minimum of $450,000 on March, 21, 1996; according to the far more persuasive testimony of Silber, it was worth as much as $1.4 million. It is not necessary for the Court to choose between these figures, however, as even the lower figure would establish that the $350,000 actually paid was not reasonably equivalent value.

In interpreting § 67d of the Bankruptcy Act of 1898, from which the current Code § 548(a)(1)(B) was largely derived, the Second Circuit held that a transfer could be avoided as constructively fraudulent only where the benefit received by the debtor was "disproportionately small" compared with the property that it gave up. *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 993 (2d Cir.1981). Courts have not attempted to impart a precise mathematical definition to the term "disproportionately small," but have instead examined transactions in the light of all surrounding circumstances, particularly whether the transaction was conducted at

---

**6.** Effective October 10, 1997, New York adopted a substantially revised version of Article 8, which repealed the writing requirement of N.Y.U.C.C. § 8–319. *See* 1997 N.Y. Laws 566, § 1. In full, former N.Y.U.C.C. § 8–319 provides:

A contract for the sale of securities is not enforceable by way of action or defense unless

(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

(b) delivery of a certificated security or transfer instruction has been accepted, or transfer of an uncertificated security has been registered, and the transferee has failed to send written objection to the issuer within ten days after receipt of the initial transaction statement confirming such registration or payment has been made but the contract is enforceable under this provision only to the extent of such delivery, registration or payment; or

(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

(d) the party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract was made for a sale of a stated quantity of described securities at a defined or stated price.

N.Y.U.C.C. § 8–319 (repealed).

arm's length, and whether the sale price was within a reasonable range of market value. *See Barber v. Golden Seed Company,* 129 F.3d 382, 387 (7th Cir.1997); *R.M.L,* 92 F.3d at 148.

Wager's own account of events strongly indicates that the March 21, 1996 sale was the result of something less than arm's length bargaining, especially considering his statement that no price other than $350,000 was ever discussed. Moreover, accepting as true Silber's testimony on the marketability of the Warrant, the Court finds that Bennett could have obtained at least $450,000 (and probably much more) simply by picking up a telephone and soliciting an offer from any reputable securities brokerage. Even by merely exercising the Warrant, Bennett could have obtained an instant paper profit of $584,000. Instead of doing any of this, Bennett chose to dispose of the Warrant in a sale (of sorts) for only $350,000.

■■■■ Where the facts and circumstances of the transaction indicate a collusive sale, as they do here, a lack of reasonably equivalent value is established by even a minuscule disparity between value given up and value received. *See Ames Department Stores, Inc. v. Wertheim Schroder & Co. (In re Ames Department Stores, Inc.),* 161 B.R. 87, 90 (Bankr. S.D.N.Y.1993) (denying the transferee's motion for summary judgment where the value received by the debtor was worth 97.875 % of the value given up). Even in the context of an arms-length transaction, it appears that the discount obtained by Wager—who paid only about 77% of the Warrant's minimum fair market value— would exceed the objective bounds of reasonably equivalent value. The Court recognizes, of course, that there is no bright mathematical line separating the reasonable discount from the constructively fraudulent discount. Instead, the standard varies depending on the precision with which the exchanged assets can be

valued, and the ease with which they can be converted to cash. As a result, a large deviation from estimated market value may be considered reasonable where the transaction involves a unique object, or intangible property, *see Salisbury v. Texas Commerce Bank–Houston, N.A. (In re WCC Holding Corp.),* 171 B.R. 972, 985 (Bankr.N.D.Tex.1994) (holding that $5,185,000 was reasonably equivalent value for sale of assets, including intangibles, later valued between $5,602,240 and $8,988,764), while the range of non-fraudulent discounts is much narrower for transactions involving cash, cash substitutes, or commodities with readily ascertainable market values. *See Sender v. Buchanan (In re Hedged–Investments Associates, Inc.),* 84 F.3d 1286 (10th Cir.1996) (holding that any cash payments to a Ponzi scheme investor in excess of the investor's cash contribution are for less than reasonably equivalent value). The Warrant at issue in the present case falls into the second category. While there was no market history of trading in the Warrant itself, the public stock quotations of the underlying AmeriData stock established an objective, ascertainable minimum value for the Warrant at all relevant times. Because this minimum value was considerably greater than the actual sale price, the Court is persuaded that the transaction was not one for reasonably equivalent value under Code § 548(a)(1)(B), and it accordingly may be avoided by the Trustee.[7]

## II. CODE § 548(c)

A final issue is whether the Trustee is entitled to recover the entire $ 2.14 million and interest held in escrow, or whether L.I. Bridge may retain the $350,000 it had originally paid to BMDC.

■■■■ In arguing that it is should be allowed to retain $ 350,000, L.I. Bridge relies on Code § 548(c), which gives a defense to good-faith transferees of avoidable transfers to the extent of the value they

7. Because the Court concludes that the transfer may be avoided as constructively fraudulent under federal law, it is not necessary to

consider the Trustee's actual fraud or state law theories.

had provided the debtor.[8] This section has been construed as an affirmative defense, all elements of which must be proven by the defendant-transferee. *See McGraw v. Allen (In re Bell & Beckwith)*, 64 B.R. 620, 631 (Bankr.N.D.Ohio 1986).

 In the context of a transfer that is avoided as constructively fraudulent, courts have held that the transferee acts in good faith only where it has an honest belief in the propriety of the activities in question, no intent to take unconscionable advantage of others, no actual intent to defraud others, and no knowledge that the transaction would operate to defraud others. *See Hirsch v. Cahill (In re Colonial Realty Co.)*, 210 B.R. 921, 923 (Bankr.D.Conn.1997). A transferee's knowledge, moreover, is determined by an objective rather than a subjective standard. *See Jobin v. McKay (In re M & L Business Machine Co., Inc.)*, 84 F.3d 1330, 1335 (holding that a transferee lacked good faith because he was on "inquiry notice" of the transferor's fraud).

 The Court finds that L.I. Bridge has not met its burden of proving that it bought the Warrant in good faith. As L.I. Bridge's sole manager, Wager was aware of numerous signs of BMDC's impending collapse; while the evidence does not necessarily indicate that he had subjective knowledge of these troubles, the flurry of short-term loans and asset liquidations to which he was privy placed Wager on at least inquiry notice of the Bennett companies' insolvency. Moreover, as an experienced businessman and financier, Wager must have known that he was acquiring the Warrant at a fire-sale price. Although Wager was obviously under no obligation to perform a full binomial analysis of the Warrant before purchasing it, a simple arithmetical computation would have told him that sale price of the Warrant was far less than its intrinsic value of $584,000 on March 21. In short, Wager should have known that the sale would operate as a fraud on BMDC's other creditors, and as such, he is excluded from the protection of Code § 548(c).

Based on the foregoing, it is hereby ORDERED as follows:

1. That pursuant to Code § 548(a)(1)(B), the sale of a Warrant for 320,000 shares of AmeriData stock from debtor BMDC to defendant L.I. Bridge Fund, L.L.C., dated March 21, 1996, is declared void, and

2. L.I. Bridge is not entitled to the protection afforded by Code § 548(c), and

3. All funds held in escrow by defendant EAB pursuant to the Escrow Agreement executed on July 15, 1996, between the Trustee and L.I. Bridge shall be turned over to the Consolidated Estates in accordance with the terms of such agreement.

8. In full, Code § 548(c) provides that:
(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.