In re LAKE STATES COMMODITIES, INC. a/k/a Lake States, Inc., Debtor.

Thomas W. Collins, Debtor.

Lawrence Fisher, as Trustee of the Estate of Lake States Commodities, Inc., a/k/a Lake States, Inc., and as Trustee of the Estate of Thomas W. Collins, Plaintiff,

v.

John Sellis, Defendant.

Bankruptcy Nos. 94 B 12123, 94 B 12125. Adversary No. 96 A 00817.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Oct. 11, 2000.

Lawrence Fisher, Linda A. Green, Lawrence Fisher & Associates, Chicago, IL, for plaintiff.

Vincent E. Lazar, Fenner & Block, Chicago, IL, for defendant.

## MEMORANDUM OPINION

SUSAN PIERSON SONDERBY, Chief Judge.

This matter is before the Court on the renewed motion for summary judgment of Defendant John Sellis ("Sellis"). For the reasons set forth below, the motion is denied.

## BACKGROUND

■ As discussed in earlier opinions in these consolidated bankruptcy cases,[1] prior to June 1994, Debtor Lake States Commodities, Inc. ("Lake States") held itself out as a business that solicited investors for commodity futures trading and participation in commodity pools. Debtor Thomas W. Collins ("Collins"), since deceased, was president of Lake States. On June 16, 1994, involuntary petitions under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* ("Code") were filed against both Lake States and Collins. Many investors lost large sums of money invested with Lake States, which was allegedly operated as a Ponzi scheme.[2]

Lawrence Fisher, trustee for the consolidated bankruptcy estates (the "Trustee"), has brought actions to recover preferential payments or fraudulent transfers against a

---

1. Reported decisions in the case are the following: *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir.1998) (*aff'g in part and rev'g in part*, 188 B.R. 958 (N.D.Ill.1995)); *In re Lake States Commodities, Inc.*, 230 B.R. 602 (Bankr.N.D.Ill.1999); *In re Lake States Commodities, Inc.*, 173 B.R. 642 (Bankr.N.D.Ill. 1994), *leave to appeal denied*, 185 B.R. 259 (N.D.Ill.1995).

2. In a Ponzi scheme, an enterprise makes payments to investors with monies received from newly attracted investors, rather than from profits of a legitimate business venture. Generally, investors are promised large returns on their investments, and initial investors are in fact paid sizeable returns. The fact of those payments helps to attract new investors, giving the impression that a legitimate business opportunity exists, even though there is no underlying business venture. All the while, promoters draw off money from the scheme, often to finance lavish lifestyles. Ultimately the scheme collapses, as more and more investors need to be attracted into the scheme so that the growing number of investors on top can get paid. A Ponzi scheme cannot last forever because the investor pool is a limited resource that will eventually run dry. *See, e,g,, Jobin v. McKay (In re M & L Business Machine Co.)*, 84 F.3d 1330, 1332 n. 1 (10th Cir.1996) ("McKay"); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 590 n. 1 (9th Cir.1991); *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 430–31 (Bankr.S.D.Tex.1997); *Jobin v. Ripley (In re M & L Business Machine Co.)*, 198 B.R. 800, 807 (D.Colo.1996) ("Ripley"); *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 437 n. 17 (Bankr. N.D.Ill.1995).

number of Lake States investors. In this adversary proceeding, the Trustee seeks to avoid an alleged fraudulent transfer to Sellis of $200,000.

It is undisputed that Sellis deposited $250,000 in his account with Lake States in the period between February 24, 1987 and November 22, 1993. During that same period of time, he received payments from Lake States totaling $450,000. Thus, as of November 22, 1993, payments from Lake States to Sellis exceeded Sellis' principal investment by $200,000.

Approximately five months later, on April 19, 1994, Sellis deposited $200,000 with Lake States. Because Sellis received no further payments from Lake States, the cash outlay of April 1994 was lost. However, if Sellis' earlier gains were netted against that loss, he would have broken even on his transactions with Lake States.

### Trustee's Complaint

■ The Trustee's eight-count complaint asserts causes of action under Code § 548(a) and under §§ 5(a)(1), 5(a)(2), and 6(a) of the Uniform Fraudulent Transfer Act, 740 ILCS 160/1 et seq. ("UFTA"),[3] applicable here by reason of the Trustee's avoiding powers under Code § 544(b).

3. UFTA § 5(a) provides as follows:
 (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
 (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
 (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
 (A) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
 (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
 740 ILCS 160/5(a).
 UFTA § 6 provides in relevant part as follows:

There are many facts common to more than one count, since the provisions of the UFTA essentially parallel Code § 548(a). *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D.Ill.1998); *In re Randy*, 189 B.R. 425, 443 (Bankr.N.D.Ill.1995). Although the parties have not pointed to any differences in the provisions of the federal and state law that would apply here, they cite only two decisions under the UFTA as adopted in Illinois. The parties' arguments are directed at the complaint generally, without reference to specific counts. Because most of the cases cited arise under the Bankruptcy Code, this memorandum will address those counts under Code § 548, without separate discussion of the UFTA.

The Trustee brings Counts I, II, V, and VI of his complaint under Code § 548(a)(1),[4] which provides as follows:

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
740 ILCS 160/6(a).

4. The complaint states that Counts I and V are brought under Code § 548(a)(1), and that Counts II and VI are brought under § 548(a)(2). Since the filing of this action, however, § 548(a) was amended by the Religious Liberty and Charitable Donations Protection Act of 1997, Pub.L. 105–183, 112 Stat. 517 (1998). As a consequence of the amendment, subsections § 548(a)(1) and § 548(a)(2) respectively have been renumbered § 548(a)(1)(A) and § 548(a)(1)(B).

hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1). Counts I and V are brought under Code § 548(a)(1)(A), on the theory that the challenged transfer was actually fraudulent, while Counts II and VI are brought under § 548(a)(1)(B), on the theory that the transfer was constructively fraudulent.

■ One decision has provided the following description of the difference between the two causes of action under Code § 548(a)(1):

The focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency are required. Culpability of the part of the ... transferees is not essential.

Unlike constructively fraudulent transfers, the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question whether the transfer is actually fraudulent.... Conversely, the transferor's intent is immaterial to the constructively fraudulent transfer in which the issue is the equivalence of the

consideration coupled with either insolvency, or inadequacy of remaining capital, or inability to pay debts as they mature.

*Plotkin v. Pomona Valley Imports, Inc. (In re Cohen),* 199 B.R. 709, 716–17 (9th Cir. BAP 1996). *See also In re FBN Food Services, Inc.,* 82 F.3d 1387, 1394 (7th Cir. 1996) (cause of action under Code § 548(a)(1)(B), commonly referred to as "constructive fraud," omits any element of intent).

In an earlier motion for summary judgment, Sellis sought the application of principles used in constructive fraud cases.

### Constructive Fraud Theory in Ponzi Scheme Cases

■ Where causes of action under Code § 548(a)(1)(B) are brought against Ponzi scheme investors, the rule applied in the majority of cases is that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers. *E.g., Sender v. Buchanan (In re Hedged–Investments, Inc.),* 84 F.3d 1286, 1290 (10th Cir.1996); *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir.), *cert. denied sub nom. African Enterprise, Inc. v. Scholes,* 516 U.S. 1028, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995) (applying Illinois law). To determine the amount recoverable from an investor, payments received from the perpetrators of a scheme are "netted" against the amounts invested. *E.g., Scholes v. Lehmann,* 56 F.3d at 757–58 (investor required to return "difference between what he put in at the beginning and what he had at the end").

■ Bankruptcy courts have generally allowed Ponzi scheme investors to retain payments up to the amount invested because investors have claims for restitution or rescission against the debtor that operated the scheme. *Jobin v. McKay (In re M & L Business Machine Co.),* 84 F.3d 1330, 1341–42 (10th Cir.1996) *("McKay");* *Merrill v. Abbott (In re Independent*

*Clearing House Co.), 77 B.R. 843, 857 (D.Utah 1987). Since investors' rights to restitution are proportionately reduced by payments received from a Ponzi scheme, to the extent of invested principal, payments from the debtor are deemed to be made in exchange for reasonably equivalent value. E.g., Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 595 (9th Cir.1991); Jobin v. Cervenka (In re M & L Business Machine Co.), 194 B.R. 496, 502 (D.Colo.1996) ("Cervenka").*

▇▇▇▇ To the extent that investors receive more than they invested, the result is different. Payments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity. *Noland v. Morefield (In re National Liquidators, Inc.), 232 B.R. 915, 919–20 (Bankr.S.D.Ohio 1998); Martino v. Edison Worldwide Capital (In re Randy), 189 B.R. 425, 437–38 (Bankr.N.D.Ill.1995).* Since these "false profits" are not paid in exchange for reasonably equivalent value, they may be recovered under § 548(a)(1)(B). *United Energy, 944 F.2d at 595 n. 6.* Under state law, an investor having actual knowledge of the underlying fraud may not have a claim for restitution, and will not be deemed to have given reasonably equivalent value in exchange for payments from a Ponzi scheme. *See McKay, 84 F.3d at 1342; Jobin v. Ripley (In re M & L Business Machine Co.), 198 B.R. 800, 808 (D.Colo.1996) ("Ripley"); Cervenka, 194 B.R. at 502.*

The netting rule applied in Ponzi scheme cases appears to modify certain legal standards relating to constructive fraud and restitution. For instance, Sellis cites a law review article which comments that an investor will be found to have given value or consideration in exchange for the return of its principal investment in a Ponzi scheme only if the investor did not know that it was investing in a fraud. Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers,* 72

Am. Bankr.L.J. 157, 167 (1998). The commentator goes on to conclude that where the matter is disputed, the trustee would have the burden of showing that an investor lacked subjective good faith, in keeping with the usual rule that the trustee has the burden of establishing a lack of value or consideration in connection with a constructively fraudulent transfer. *Id.* At the same time, the author acknowledges that good faith is arguably irrelevant in cases based on constructive fraud. *Id.* at n. 44. The discussion ends with the following comment:

What the [netting] rule means as a practical matter is that a trustee need only determine whether an investor was a net-winner or net-loser when ascertaining whether the investor received profit; the trustee need not match up each investment with each payment made by the debtor and follow the parties' characterizations of the transfers. This may be the only workable rule in the typical Ponzi-scheme case, where documentation of transfers is less than complete, payments are sporadic and not always in accordance with the documentation of the investment, and neither the investor nor the debtor can recall precisely what the parties intended.

*Id.* at 169.

▇▇▇▇ Where gains and losses from transactions are netted against one another, there is no inquiry into whether, at the time of each transfer from a Ponzi scheme, an investor had a cause of action for restitution against the promoter. Technically, though, if at any point in time cumulative payments to an investor exceed the total amount of money the investor has previously paid in, there would be no cause of action for restitution. Since the Ponzi scheme cases compare only the total amount invested with the total amount paid out, that analysis would generally permit an investor to retain more than if each transfer of funds from the scheme was analyzed separately.

Here, the sizeable April 1994 investment came last in the series of Sellis' transactions with Lake States. Nonetheless, the Trustee has not argued that netting is necessarily unavailable when a payment to an investor is the last in a series of exchanges between investors and a Ponzi scheme operator.[5] Rather, in seeking recovery of false profits from the November 1993 transfer, the Trustee has argued that the April 1994 investment should viewed as a distinct investment from Sellis' earlier investments in Lake States. Uniformity of investment intent, rather the temporal sequence of investments and payments, would be the criterion for deciding when netting is allowable.

### Decision on First Motion for Summary Judgment

Earlier in this case, Sellis moved for summary judgment, seeking a finding that because there would be no profit to him if all his transactions with Lake States were netted, none of the payments to him were fraudulent transfers. Then, as now, the Trustee did not dispute that Sellis had no knowledge of the alleged Ponzi scheme through November 1993. With respect to the April 1994 investment of $250,000, however, he took the position that Sellis might have invested while knowing of the true nature of Lake States' operations.

As discussed in the Court's February 4, 2000 decision on Sellis' motion, the Trustee had received information from third party sources that led him to believe that the April 1994 investment was a short-term loan made to help ward off a "run" by Lake States investors to withdraw funds. According to the Trustee, there was reason to believe that in or around April 1994, Collins and his co-conspirators solicited Sellis and others to make short-term loans

to Lake States at an interest rate of fifteen percent per month. Under the Trustee's theory, investor advances made in response to that inducement were not made with the belief that funds would be invested in commodities trading.

Sellis took the position that the Trustee could not prove he actually knew that the Debtors operated a fraudulent scheme, but his evidence consisted primarily of his own affidavit testimony that at all times he believed Lake States to be a legitimate enterprise. Sellis did not address the circumstances surrounding his decision to invest in April 1994, and he had not yet been deposed in this proceeding.

Both sides argued that their position was supported by a decision where the equity receiver for a Ponzi scheme operator was allowed to recover false profits from an investor who had made two different investments in the enterprise. *Scholes v. Ames*, 850 F.Supp. 707 (N.D.Ill.1994), *aff'd in part and rev'd in part on other grounds sub nom. Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir.), *cert. denied sub nom. African Enterprise, Inc. v. Scholes*, 516 U.S. 1028, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995). In *Scholes v. Ames*, the investor argued that he should be able to net the false profits he had received in an individual capacity against his loss on a later pooled investment under a broker's name. *Id.* Although the judge in *Scholes v. Ames* declined to allow the "profit" from the first investment to offset the loss on the second investment, he did not find that the investment giving rise to a loss must invariably precede the payment of profits against which the loss would be netted. The opinion comments that "due to the formalities of [the two] investments they cannot be held to constitute a net loss." *Id.* at 712. The result in *Scholes v. Ames*

---

5. The evidence of record does not fully explain what criteria the Trustee employed in deciding which Lake States investors would be named as defendants in his fraudulent transfer actions. However, the Trustee's deposition testimony suggests that he generally has not brought fraudulent conveyance actions against investors who did not receive more than the principal amount of their investments with Lake States. Fisher Dep. at 15. Absent some criterion that distinguishes him from the others, Sellis would seem to fall within that group.

turned in part on the fact that the broker had submitted a claim for the full amount of funds invested through the pooled account. *See id.* at 714. Were the individual investor allowed to net false profits from the individual account against the amount invested later as part of the pooled account, there was a prospect of double recovery on the same claim. *See id.*

In ruling on Sellis' first motion, this Court observed that the Trustee pursued a novel theory in that he would have bifurcated Sellis' relationship with Lake States into two periods—one in which Sellis would be treated as a mere victim of the alleged Ponzi scheme, and one during which Sellis would be treated as an investor having knowledge of the unlawful nature of the Debtors' enterprise. Were it found that he had actual knowledge at the time of his April 1999 investment, Sellis would not be entitled to offset the loss on that investment against the "false profits" he received from Lake States during the earlier "innocent investor" period. Since there were outstanding factual issues as to whether the April 1994 investment was made with a different state of mind than that which accompanied Sellis' earlier investments, the motion for summary judgment was denied without prejudice to Sellis' ability to renew the motion after the close of discovery in this case.

This Court's February 4, 2000 opinion commented that the decision in *Scholes v. Ames* is not binding precedent. The Court also observed that there was a factual dissimilarity between the two cases, since the investments addressed in this adversary proceeding were all made by Sellis in his individual capacity.

### Trustee's Theory on Renewed Motion for Summary Judgment

In the interval between the initial and renewed motions for summary judgment,

Sellis and one or more other investors have testified in the criminal trial of Edward Collins, one of Lake States' insiders. In addition, Sellis was deposed in this lawsuit.

Since the decision on Sellis' earlier motion, the Trustee has modified his theory concerning the April 1994 investment. He now contends that in or around April 1994, Sellis was informed that because of a regulatory audit, an insurance company had to liquidate an investment with Lake States of over two million dollars. The Trustee cites evidence that Sellis and others, including his brother and a cousin, were told that the insurance company's positions would be assigned and reallocated to investors willing to invest the amount of funds that the insurance company was withdrawing. Per the representations made, the acquired account would be liquidated and distributed within approximately two months, by June 1994.

According to the Trustee, Sellis and fellow investors raised one million dollars to purchase a pro rata portion of the insurance company's positions. Of that amount, $200,000 represented Sellis' contribution. The Trustee emphasizes that the investment objective underlying Sellis' April 1994 deposit was different than that which motivated his earlier investments in Lake State. To that end, he points to the following passage from Sellis' testimony at Edward Collins' criminal trial: "I remember specifically telling [Edward Collins] that I didn't want this money to stay in long term like the other money I had in there, and I wanted it back as soon as this position was closed in June." Although the Trustee no longer contends that Sellis was guaranteed a return of fifteen percent per month on the April 1994 investment, the parties dispute whether Sellis believed there was a guaranteed profit to be made on his $200,000 investment.[6]

---

6. This dispute concerns anticipated gains on commodities positions that never existed. Had there been open positions for Sellis and others to assume, profit would have come

from "unrealized gains," which Sellis describes as current market profit on open commodity futures positions that have not yet been liquidated. The Trustee agrees with Sel-

The Trustee admits that he has no information indicating that prior to June 1994, Sellis or any investors outside Lake States' circle of insiders knew that the Debtors were operating a Ponzi scheme. It is also undisputed that the large number of investor withdrawals in April 1994 were not made in response to reports that Lake States was operating a Ponzi scheme. Rather, the "run" was caused by a change in the methodology that Lake States used to report taxable income to investors. Before that time, Sellis had always been able to withdraw funds from his account, and none of Lake States' checks to him were dishonored.

In connection with his April 1994 deposit, Sellis received a promissory note substantially identical to those he had received in connection with his earlier investments with Lake States.[7] Although Sellis' account statement for that month does not reflect an investment or deposit by him, he states that the deposit came from his personal funds and was to be credited to his personal account. Sellis was a member of Springhill Partners, an entity that maintained a separate account with Lake States. However, there is no allegation or

evidence that Sellis' April 1994 investment was credited to Springhill Partners. Nor has the Trustee produced evidence from Lake States' accounting records that a joint account was opened for Sellis and the others who invested in April 1994.

### Evidence Concerning Sellis' Experience as an Investor

Throughout the period he invested with Lake States, Sellis received monthly statements which indicated an account balance far in excess of the amounts he had deposited. For instance, at the end of November 1993, Sellis' statement showed an account balance of $2,478,229, and unrealized gains of $71,624. A later statement showed an account balance of $2,749,603, and unrealized gains of $271,031 as of March 31, 1994. Sellis maintains that statements for March and April 1994 respectively indicated monthly returns of 3 percent and 2 percent, but the Trustee contends that such rates of return are incorrectly calculated, and that they would have been considerably larger if computed on the basis of the cash Sellis actually invested.

lis that unrealized gains on commodities trading are generally subject to market fluctuations or even total loss in the event of negative market movement, but he denies that Sellis actually believed that he might lose his April 1994 investment.

According to the Trustee, Sellis was told that the positions offered in April 1994 included both realized and unrealized gains. As this Court understands the term, realized gains would be profit associated with completed commodities transactions. The underlying commodities transaction having been closed, realized gains would be fixed, and proceeds or credits from the transaction would be available to offset losses from other transactions. (The parties do not explain why a position on which gain has been realized is still "open" it would seem that an investor should be able to cash out the proceeds of completed transactions.)

The parties have argued at some length as to whether Sellis could have anticipated a return on his April 1994 investment. The return would have been equal to the amount by which gains realized prior to

April 19, 1994 exceeded losses caused by market fluctuations after that date. The arguments on this point are totally speculative, however, since the positions did not exist, and it is undisputed that Sellis and others were never informed as to the identity and amounts of the positions they would assume. The only competent testimony concerning Sellis' expectations is his own affidavit testimony that he was not promised a specified rate of return, and that he believed he might not make any profit if the market turned against him.

7. During the first few years that he invested with Lake States, Sellis had received copies of lengthy statements that purported to show what commodities were being traded by Lake States. Lake States discontinued that practice around 1990, however. Beginning around 1990, Lake States began to issue promissory notes reflecting the principal amount of Sellis' investments in Lake States. The evidence submitted as exhibits to the pleadings indicates that at least some of the notes were not payable until 25 years from the date they were issued.

According to Sellis, profits apparently reflected on his statements from Lake States did not seem unreasonable to him, given his belief that Lake States was engaged in commodities trading. He also attests that in connection with options trading, he has experienced greater profits than those shown on Lake States' statements. Sellis provides no details concerning his other experiences as an investor, however, and he relies solely on his own testimony to rebut the Trustee's contention that the returns shown on Lake States' statements were exorbitant.

Sellis allowed the Debtors to make all investment decisions for him. It is undisputed that he was never informed as to what particular commodities contracts were being purchased for his account, and that he did not control or direct any particular trading activity. Sellis made the $200,000 investment in April 1994 without having been shown statements detailing unrealized gains associated with the open positions that purportedly were being offered.

## DISCUSSION

In this motion for summary judgment, Sellis renews his argument that for purposes of determining the amount of any fraudulent transfer to him, his investment of April 1994 should be netted against his earlier investments through November 1993. Taking into account the new evidence since the decision on his first motion, Sellis argues that the Trustee cannot demonstrate that at the time of his April 1994 investment, he knew of the true nature of Lake States' operations.

Responding, the Trustee argues that "[b]ecause of the emergency money-raising efforts [in April 1994], and also because of the extravagant returns reported to the investors for a seven-year period, a reasonably prudent investor would have inquired concerning Debtor's financial situation and the legitimacy of its business operations." Memorandum of Law in Opposition to Defendant's Renewed Motion for Summary Judgment at 8. Given the evidence that Sellis and several others endeavored to collect sufficient funds to purchase what was represented to be the account of a single investor, the application of *Scholes v. Ames* is also at issue on the renewed motion for summary judgment. Notably, the parties do not make separate arguments with respect to those counts in which an actually fraudulent transfer under Code § 548(a)(1)(A) is alleged, and those counts where the cause of action is based on constructive fraud under Code § 548(a)(1)(B).

### Standard on Summary Judgment

Summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Bellaver v. Quanex Corp.*, 200 F.3d. 485, 491 (7th Cir.2000); *Feldman v. American Memorial Life Ins. Co.*, 196 F.3d 783, 789 (7th Cir.1999). In considering the motion, the Court reviews the record in the light most favorable to the nonmoving party and it draws all reasonable inferences therefrom in the nonmovant's favor. *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1057 (7th Cir.2000); *Filipovic v. K & R Express Systems, Inc.*, 176 F.3d 390, 395 (7th Cir.1999). Partial summary judgment is available if it disposes of one or more counts of a complaint in their entirety. *S.N.A. Nut Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa. (In re S.N.A. Nut Co.)*, 210 B.R. 140, 143 (Bankr.N.D.Ill.1997).

The task on a motion for summary judgment is to determine whether there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996), *cert. denied*, 519 U.S. 1115, 117 S.Ct. 957, 136 L.Ed.2d 843 (1997); *Waukesha Foundry,*

*Inc. v. Industrial Engineering, Inc.*, 91 F.3d 1002, 1007 (7th Cir.1996). On such a motion, it is not the court's function to resolve factual disputes or to weigh conflicting evidence. *Id.* If material facts are not in dispute, the sole question is whether the moving party is entitled to a judgment as a matter of law. *ANR Advance Transp. Co. v. International Bhd. Of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir.1998).

Where the nonmovant bears the burden of proof on an issue at trial, a party may procure an order of summary judgment in its favor by demonstrating that the nonmovant will be unable to produce any evidence at trial supporting an essential element of its claim. *Logan v. Commercial Ins. Co.*, 96 F.3d 971, 979 (7th Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). To avoid summary judgment, the nonmovant must supply evidence sufficient to allow a jury to render a verdict in its favor. *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140 (7th Cir.1998). If no reasonable finder of fact could find for the nonmovant, summary judgment is mandatory. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806 (7th Cir.2000).

Conversely, where the party seeking summary judgment is the plaintiff, or the party bearing the burden of proof at trial, the standard is more stringent. *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992). In that scenario, the movant bears the burden of establishing a prima facie case that would entitle it to a directed verdict if the issue was uncontested at trial. *Orozco v. County of Yolo*, 814 F.Supp. 885, 890 (E.D.Cal.1993).

*Matters Established on Renewed Motion for Summary Judgment*

Applying the above principles here, the Trustee has not produced evidence supporting his premise that Sellis' April 1994 deposit must be treated as separate and distinct from his earlier investment in Lake States. The Trustee contends that Sellis knew of the emergency nature of Lake States' fund-raising efforts in April 1994, but he has presented no competent evidence to corroborate that allegation. The evidence of record shows only that Sellis believed that he and others would assume the profitable positions of another investor. Different representations might have induced Sellis to make the April 1994 investment, but there is no evidence here that contradicts Sellis' assertion that he believed the ultimate source of that profit would be commodities trading.

The fact that Sellis invested along with others is also insufficient to place this case within the decision in *Scholes v. Ames.* Here, there is no overlap between Sellis' claim against the Debtors and the claim of Springhill Partners. Nor is there evidence that Lake States opened a joint account for Sellis and his coinvestors in April 1994. As was not the situation in *Scholes v. Ames*, the formalities of the two investments are not such that the November 1993 "profit" cannot be netted against the April 1994 loss. Based on the undisputed facts, the Court concludes that Sellis has overcome those objections to the netting of transactions that the Trustee raised on his first motion for summary judgment.

The analysis does not end here, however. It may be too much of a simplification to conclude that because Sellis was not actually aware of the true nature of Lake States' operations, he is entitled to net the November 1993 payment to him against the April 1994 loss. To prevail on his motion for summary judgment, Sellis must establish that he is entitled to judgment as a matter of law and undisputed fact. That analysis is made separately with respect to each count of the Trustee's complaint.

*Counts I and V—Actually Fraudulent Transfers Under Code § 548(a)(1)(A)*

Under § 548(a)(1)(A), a trustee may recover the full amount paid a Ponzi

scheme investor unless the investor can establish the defense under § 548(c) [8] that it received payments from the scheme "for value and in good faith." *Ripley*, 198 B.R. at 809 n. 3. Here, Sellis has not challenged the Trustee's ability to establish that the Debtors' transfers to him were actually fraudulent. Instead, his arguments go to the good faith defense under § 548(c).

■ Looking to the first of the two elements under § 548(c), "value" is defined in Code § 548(d)(2)(A) as including the satisfaction of an antecedent debt. *Hedged–Investments Assoc.*, 84 F.3d at 1289. As has been noted in connection with the discussion of constructive fraud, the reduction of a transferee's claim for restitution can constitute "value."

■ The Code does not define "good faith," a term which is not susceptible of precise definition and which is generally determined on a case-by-case basis. *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir.1995). Under the case law, "good faith" is construed as having an objective component. *Jobin v. McKay*, 84 F.3d at 1335. In Ponzi scheme cases, if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and if a diligent inquiry would have discovered the fraudulent purpose, then the challenged transfer is fraudulent. *Ripley*, 198 B.R. at 810. Some factors relevant to the analysis are the defendant's experience as an investor, whether the debtor promised rates of return greatly exceeding market rates, whether the debtor provided implausible explanations as to how it could pay those extremely high rates, and factors that would indicate insolvency, such as a debtor's use of postdated checks or history of dishonored checks. *See, e.g., McKay*, 84

F.3d at 1338–39. Facts sufficient to warrant a finding of inquiry notice will generally defeat the good faith essential to the defense under § 548(c). *Cohen*, 199 B.R. at 720. *But see Moglia v. Universal Automotive, Inc. (In re First Nat'l Parts Exchange, Inc.)*, No. 98 C 5915, 2000 WL 988177 (N.D.Ill. July 18, 2000) (concluding that finding of good faith might not be precluded where transferee proceeds after reasonably accounting for warning signs of debtor's precarious financial condition, and in full awareness and acknowledgment of corresponding risks); *In re Telesphere Communications, Inc.*, 179 B.R. 544, 559 (Bankr.N.D.Ill.1994) (same).

■ In support of his contention that he acted in good faith, Sellis notes the undisputed evidence that prior to Lake States' collapse, only insiders knew that it was not a legitimate business operation. With respect to the Trustee's allegations that the excessive returns reported on his account statements should have put him on notice that something was amiss, Sellis argues that the Trustee has presented no expert evidence regarding the range of rates of return that could reasonably have been realized on profitable commodities trading during the 1993–1994 time period. Also, several decisions state that a mere high rate of return is insufficient to put investors on inquiry notice of a Ponzi scheme, especially when the debtor initially paid the promised return to the investors. *Independent Clearing House*, 77 B.R. at 862 (D.Utah 1987); *Levey v. Razee (In re Pate)*, Adv. No. 95 A 985, slip op. at 14 (Bankr.N.D.Ill. Feb. 21, 1997).

On the other hand, Sellis has presented no evidence concerning his prior experience as an investor, and the record contains no competent evidence supporting his allegation that the returns indicated on his account statements would have seemed

---

**8.** Section 548(c) provides that "[e]xcept to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on

or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c).

reasonable to similarly situated investors. Sellis also states that he invested $200,000 in April 1994 without asking for details regarding the positions purported to be available. Drawing inferences in favor of the Trustee, there are questions of fact as to whether the circumstances would have placed a reasonable person on notice of the Debtors' fraudulent purpose.

 The defendant bears the burden of proof on the defense under § 548(c). *E.g., Jobin v. McKay,* 84 F.3d at 1338; *Breeden v. L.I. Bridge Fund (In re Bennett Funding Group, Inc.),* 232 B.R. 565, 570 (Bankr.N.D.N.Y.1999). In order for a defendant to prevail on a summary judgment motion based on an affirmative defense, the defendant must adduce evidence supporting each element of its affirmative defense, and the evidence must be such that no reasonable jury would disbelieve it. *Herndon v. Massachusetts General Life Ins. Co.,* 28 F.Supp.2d 379, 382 (W.D.Va. 1998).

Here, Sellis has focused on factors bearing on whether he actually knew that Lake States was operating a fraudulent scheme. Sellis has not addressed those factors needed to determine whether he objectively should have known of the unlawful nature of the enterprise. Because Sellis has not established as a matter of law and undisputed fact that he is entitled to judgment on his good faith defense, summary judgment is denied with respect to Counts I and V of the Trustee's complaint.

### Counts II and VI—Constructively Fraudulent Transfers Under Code § 548(a)(1)(B)

Previously in this decision, this Court concluded that there is no evidence that Sellis actually knew that Lake States was operated as a Ponzi scheme. That determination having been made, the next question is whether it follows that Sellis is entitled to a judgment in his favor on the Trustee's constructive fraud counts. As discussed earlier, to the extent of principal invested, payments to innocent Ponzi scheme investors are deemed to be made in exchange for value. That value takes the form of a reduction of investors' claims for restitution.

There are statements in the case law that a subjective test is used to determine whether an investor has a claim for restitution, and that reduction of that claim constitutes "reasonably equivalent value" under § 548(a)(1)(B). *E.g., Cervenka,* 194 B.R. at 502. As noted in the discussion of constructive fraud earlier in this opinion, some decisions appear to abbreviate the analysis, creating the impression that they view "lack of subjective good faith" as an element of the cause of action under § 548(a)(1)(B). Were one to accept that premise, the argument on summary judgment would be that because the Trustee cannot show that Sellis actually knew of the Debtors' fraudulent scheme, the Trustee cannot establish an essential element of his cause of action for recovery of a constructively fraudulent transfer.[9]

 For a number of reasons, this Court cannot agree that the Trustee necessarily has the burden of proof on the question whether Sellis knew of the true nature of Lake States' operations. Looking first to the language and structure of Code § 548, it bears noting that the state of mind of the transferee is not an element of either of the two causes of action under § 548(a). In addition, the defense under § 548(c), which requires a showing of objective (rather than subjective) good faith, is a defense to both causes of action.

---

9. Where, as here, a complaint contains counts under both subsections of Code § 548(a)(1), victory on the constructive fraud counts may be of little practical value to the transferee, since a trustee may recover the full amount of a transfer if the debtor made the transfer with actual intent to defraud. *See, e.g., Ripley,* 198 B.R. at 809 n. 3. In that scenario, the transferee will only avoid liability if it can establish good faith as measured by an objective standard. *Id.*

**880**

■ The Court believes that instead of framing the inquiry in terms of whether investors are "innocent," the analysis under Code § 548(a)(1)(B) should look to whether investors have a claim for restitution against the promoters of a Ponzi scheme. Where it is alleged that reduction of an investor's claim for restitution provides consideration for a transfer challenged as constructively fraudulent, it would seem that the investor would at least have to make a prima facie showing of entitlement to restitution. · Ultimately, the Trustee would have the burden of proving that the claim for restitution provided less than a reasonably equivalent value for payments to the investor.

■ In their briefs on this motion, the parties have not discussed the cause of action for fraudulent inducement that would give rise to a claim for restitution under Illinois law.[10] Without some discussion of this legal issue, this Court will not assume that objective factors are necessarily irrelevant to the underlying question whether an investor has a claim for restitution. On the present record, the Court declines to find that a constructive fraud claim will invariably be defeated if a Ponzi scheme investor lacked actual knowledge of the fraudulent scheme perpetrated by a debtor.

■ There are outstanding questions of law and fact bearing on whether Sellis gave reasonably equivalent value for Lake States' transfers to him. Because Sellis has not established that the Trustee is unable to prove constructive fraud, the

Court denies his motion for summary judgment on Counts II and VI.

### CONCLUSION

For the reasons set forth above, the Court denies Defendant John Sellis' renewed motion for summary judgment.

---

**10.** Under Illinois law, where a party has been fraudulently induced to enter a contract, it may sue to have the contract rescinded, with restitution ordered. *Wobble Light, Inc. v. McLain/Smigiel Partnership*, 890 F.Supp. 721, 723 (N.D.Ill.1995); *Sciarabba v. Chrysler Corp.*, 173 Ill.App.3d 57, 61, 527 N.E.2d 368, 371, 122 Ill.Dec. 870, 873 (1988), *leave to appeal denied*, 123 Ill.2d 567, 535 N.E.2d 411, 128 Ill.Dec. 900 (1988). Fraud requires proof that a defendant: (1) made a false statement of material fact, (2) knowing that the statement was false, and (3) intending that the

plaintiff rely on the statement, (4) that the plaintiff did rely on the statement, (5) that reliance was justified, and (6) that the plaintiff ·suffered damage as a result. *In re Zolner*, 249 B.R. 287, 293 (N.D.Ill.2000).

While the Supreme Court has indicated that under the common law, a fraud victim's reliance is measured under a subjective standard, it cautions that objective factors may be relevant to the analysis. *See Field v. Mans*, 516 U.S. 59, 72–76, 116 S.Ct. 437, 444–46, 133 L.Ed.2d 351 (1995).