In re Stanley W. JACKSON, Debtor.

Victor Dahar, Chapter 7
Trustee, Plaintiff,

v.

Stanley W. Jackson, individually, and Susan W. Jackson, individually and as Trustee of SWJ Trust I and SWJ Trust II, and Stanley W. Jackson, Jr., Defendants.

Bankruptcy No. 01–13153–JMD.
Adversary No. 02–1136–JMD.

United States Bankruptcy Court,
D. New Hampshire.

Dec. 7, 2004.

8

9

Richard Thorner, Esq., Stephen L. Boyd, Esq., Wadleigh, Starr & Peters, PLLC, Manchester, NH, for the Chapter 7 Trustee/Plaintiff.

Thomas J. Pappas, Esq., Wiggin & Nourie, P.A., Manchester, NH, for Defendants Susan W. Jackson, Individually and as Trustee of SWJ Trust I and SWJ Trust II and Stanley W. Jackson, Jr.

John R. Michels, Esq., Michels & Michels, Londonderry, NH, for Defendant Stanley W. Jackson.

### MEMORANDUM OPINION

J. MICHAEL DEASY, Bankruptcy Judge.

### I. INTRODUCTION

Victor Dahar, Chapter 7 Trustee (the "Plaintiff"), commenced this adversary proceeding against Stanley W. Jackson (the "Debtor"), Susan W. Jackson, individually, and as Trustee of SWJ Trust I and SWJ Trust II (collectively the "Defendant"), and Stanley W. Jackson, Jr. (the "Son") seeking to set aside certain property transfers as fraudulent transfers pursuant to N.H.Rev.Stat. Ann. § 545–A:4 (1997) ("NH RSA") and 11 U.S.C. § 548(a).[1] On September 19, 2003 the Court granted summary judgment for the Plaintiff on his sole claim against the Son avoiding the transfer to him on October 9, 2001 of $25,000.00 (Doc. No. 44). After a four-day trial against the Debtor and the Defendant, the remaining parties submit-

---

1. Unless otherwise indicated, all references to "section" or "§" refer to Title 11 of the United States Code.

ted post-trial memoranda and the Court took the case under advisement.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTS [2]

This is an action to set aside certain prepetition transfers made by the Debtor to the Defendant. The transfers consisted of parcels of real property (the "Subject Parcels") as well as various mortgage receivables (the "Subject Receivables"), all identified in the complaint.

On or about August 22, 1990, the Debtor executed a term note (the "Note") [3] in the amount of $800,000.00 [4] The Note was subsequently assigned to Citizens Bank. At some point the Debtor made a $20,000.00 payment on the Note. The testimony and evidence reflected that the Debtor and Citizens Bank were at odds over the bank's responsibilities under the Note.[5] For several years the Debtor and Citizens Bank exchanged demands and settlement offers in an attempt to resolve the amounts due under the Note. The Debtor ultimately rejected a settlement offer of $100,000.00. On January 21, 1998, Citizens Bank notified the Debtor that it intended to commence foreclosure proceedings. However, no such proceedings were ever instituted by the bank.

On June 3, 1999, the Debtor transferred the Subject Parcels to the Defendant for no consideration. The Debtor and the Defendant testified that the transfers took place for estate-planning purposes.[6] The Debtor and Defendant testified that the impetus for the estate planning was the Debtor's scheduled hip surgery and the fact the Debtor and the Defendant had not reviewed or updated their estate plan for at least twenty years.

On December 16, 1999, approximately six months after the Debtor transferred the Subject Parcels to the Defendant, Al Ho, LLC ("Al Ho") acquired the Note from Citizens Bank. On March 22, 2000, Al Ho demanded that the Debtor satisfy the balance due. According to Al Ho, the amount due was then in excess of one

---

2. The Court notes that the evidence for this case was voluminous, often redundant, and frequently contradictory. The quantity and organization of the evidence also confused the parties and their respective counsel. Charts and graphs submitted by the parties both during trial and in their post-trial memoranda were found to contain material errors or omissions. Although the Court believes the errors and omissions were inadvertent, it was necessary for the Court to devote considerable time and effort to verify and correct the charts and exhibits submitted as evidence or argument by the parties.

3. The Note was secured by mortgages on the Debtor's property located in Ashland, Groton, Plymouth and Danbury, New Hampshire.

4. The Note was executed as part of a settlement between the Debtor and First NH Mort-

gage Corporation, which involved amounts that were due in connection with a failed condominium project.

5. Apparently the dispute revolved around a yearly accounting Citizens Bank allegedly failed to provide, which the Debtor contended discharged his obligations under the Note.

6. The Debtor and Defendant testified that transfers resulted from the advice of estate-planning counsel to equalize the estates of the Debtor and Defendant and to create two trusts, SWJ Trust I and SWJ Trust II, to hold the assets of the Debtor and Defendant, and to obtain the maximum benefit of the marital deduction for federal estate tax planning purposes.

million dollars. No payments were made, and Al Ho foreclosed on the mortgaged properties securing the Debtor's obligations under the Note on May 10, 2000. The sale resulted in $277,500.00 in proceeds. This left a claimed deficiency balance of $877,129.14, which Al Ho demanded payment of on May 25, 2000.

The Debtor initiated a state court proceeding disputing the validity of the Note. On February 8, 2001, the Merrimack County Superior Court issued a written opinion granting Al Ho's Partial Motion for Summary Judgment, overruling the Debtor's objections, and finding, *inter alia*, that, "no reasonable jury could conclude that [Citizens Bank's] failure to provide accountings constituted a material breach of the settlement agreement that would excuse [the Debtor] from paying $780,000.00 of an $800,000.00 debt." (Trial Exhibit 56 at 129.) On May 29, 2001, the Debtor and Al Ho stipulated to an order of judgment in the amount of $931,818.56. The stipulated order barred the Debtor from transferring any property or assets from May 29, 2001, until July 13, 2001.

Five days before the stipulated order was signed, the Debtor had transferred, for consideration, two of the Subject Receivables to the Defendant. The Debtor then transferred, for consideration, the remainder of the Subject Receivables on July 13, 2001, which was the deadline for the forbearance pursuant to the stipulated order. The Debtor filed his bankruptcy petition on October 15, 2001, and, on September 26, 2002, the Plaintiff commenced this adversary proceeding.

The Plaintiff's complaint is based upon two claims of a right to recover fraudulent transfers. First, Plaintiff alleges the Debtor made fraudulent transfers of the Subject Parcels in violation of state fraudulent transfer laws, NH RSA 545–A:4 and 545–A:5, for which the Plaintiff seeks recovery of the Subject Parcels. Second, the Plaintiff alleges the Debtor made fraudulent transfers of the Subject Receivables in violation of section 548 of the Bankruptcy Code for which the Plaintiff seeks to avoid the transfers of Subject Receivables.

## III. DISCUSSION

### A. New Hampshire Uniform Fraudulent Transfer Act (NH RSA 545–A)

#### 1. Background

The Plaintiff brought his complaint under section 544(b) of the Bankruptcy Code seeking to avoid the transfers of the Subject Parcels under the New Hampshire Uniform Fraudulent Transfer Act ("UFTA"), NH RSA 545–A, which provides in pertinent part:

**545–A:4 Transfers Fraudulent as to Present and Future Creditors.**

I. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he would incur, debts

beyond his ability to pay as they became due.

II. In determining actual intent under subparagraph I(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider;

(b) The debtor retained possession or control of the property transferred after the transfer;

(c) The transfer or obligation was disclosed or concealed;

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or after a substantial debt was incurred; and

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

**545–A:5 Transfers Fraudulent as to Present Creditors.**

I. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Under UFTA, transfers may be found to be fraudulent if made with actual intent to defraud ("actual" fraud) [7] or if made under circumstances which, in the absence of actual fraud, are deemed to be fraudulent ("constructive" fraud).[8]

### 2. Burden of Proof

■ The Defendant argues the proper standard of proof to use under NH RSA 545–A:4 is the "clear and convincing" evidence standard. However, all the authorities cited by the Defendant predate the adoption of UFTA, and the New Hampshire Supreme Court has not yet addressed this issue under UFTA. The pre-UFTA case law clearly states that the, "plaintiff has the burden of proving by clear, convincing and direct evidence the existence of a fraudulent intent." *Chagnon Lumber Co. v. DeMulder*, 121 N.H. 173, 176, 427 A.2d 48 (1981), *citing Jenney v. Vining*, 120 N.H. 377, 381, 415 A.2d 681 (1980). Those cases involved actual fraud. There is nothing in the Bankruptcy Code to indicate that Congress meant to displace state law standards of proof when the estate seeks to avoid a transaction under section 544. *See In re Kelton Motors, Inc.*, 130 B.R. 170, 182 (Bankr.D.Vt. 1991); *cf. Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 21–22, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000).

---

7. NH RSA 545–A:4(I)(a).

8. NH RSA 545–A:4(I)(b).

The actual intent of the debtor is irrelevant, however, when the issue is constructive fraud under UFTA and NH RSA 545:4(I)(b) or 545:5(I). Constructive fraud involves objective factors. Where applicable law does not require a heightened burden of proof, it appears most states that have enacted UFTA apply the preponderance of the evidence standard for constructive fraud. *See Word Invs., Inc. v. Bruinsma (In re TML, Inc.)*, 291 B.R. 400, 436–37 (Bankr.W.D.Mich.2003). The parties have not cited, and the Court has not found, any New Hampshire authority establishing a heightened burden of proof for constructive fraud under UFTA.

■ Therefore, the Court finds that, under UFTA, the Plaintiff must prove actual fraud by clear and convincing evidence and constructive fraud by a preponderance of the evidence.

### 3. Evidence on Actual Fraud: NH RSA 545–A:4(I)(a)

■ Actual fraud requires proof that "the debtor made the transfer … with actual intent to hinder, delay, or defraud any creditor of the debtor." NH RSA 545–A:4(I). The Debtor's intent at the time of the transfers is the issue. *Id.* The economic effect of a transfer has no direct bearing on the Debtor's intent. However, the economic effect itself may be circumstantial evidence which could help establish actual intent (i.e. post-transfer insolvency may constitute evidence of intent).

■ In the absence of direct evidence of actual intent, the facts and circumstances surrounding the transfer, taken together, may establish actual intent. The facts and circumstances generally examined by the courts in determining whether actual fraud has occurred are referred to as the "badges of fraud." The badges of

fraud are partially set forth in UFTA.[9] The statutory badges of fraud are "a nonexclusive catalogue of factors appropriate for consideration by the court in determining whether the debtor had an actual intent to hinder, delay, or defraud one or more creditors." Unif. Fraudulent Transfer Act § 4, cmt. 5, 7A U.L.A. 654 (2004).

■ Whether specifically enumerated in the statute, grounded in case law, or based on the unique facts of a particular case, the badges of fraud are always circumstantial evidence from which the fact finder may logically infer fraudulent intent. *See In re Poole*, 15 B.R. 422, 431–32 (Bankr. N.D.Ohio 1981) ("In determining whether a conveyance is made with actual intent …, direct evidence of fraudulent intent is not essential and, indeed, in most circumstances, not likely to be available. Consequently, certain traditionally designed 'badges' or indicia of fraud … have generally been held to be sufficient to show fraud …."). These logical inferences are permitted because courts are cognizant of the traditional difficulties associated with proving fraudulent intent. Absent a rare admission or declaration against interest by the defendant, a plaintiff is unlikely to discover any direct proof of bad motives because often only the defendant knows his own motivation at the time of the transfer. *In re Miami Gen. Hosp., Inc.*, 124 B.R. 383, 391 n. 4 (Bankr.S.D.Fla.1991) ("Because of the difficulty in proving actual subjective bad intent, … the Uniform Fraudulent Conveyance Act [was adopted] which enables a court to ignore actual fraudulent intent and look to constructive fraudulent intent."); *In re Reininger–Bone*, 79 B.R. 53, 55 (Bankr.M.D.Fla.1987) ("[A]ctual intent to defraud is rarely subject to direct proof.").

---

9. NH RSA 545–A:4(II).

14

The law, therefore, allows the badges to act as a substitute for direct proof of intent and permits, but does not require, the fact finder to draw inferences of bad intent from them. Any badge of fraud is potentially relevant to proving fraudulent intent, but no single badge alone creates a presumption of bad intent. Unif. Fraudulent Transfer Act § 4, cmt. 5, 7A U.L.A. 654 (2004). However, if the badges coalesce in the combination needed to prove constructive fraud, then fraud is "conclusively" presumed "without regard to the actual intent of the parties." *Id.* Indeed, even the most obvious badge of fraud—transfers made during the pendency of a suit—is often inconclusive of fraudulent intent unless accompanied by more. *Jacksonville Bulls Football, Ltd. v. Blatt*, 535 So.2d 626, 629 (Fla.Dist.Ct.App. 1988) ("[T]he mere fact that suit is pending against a person, or that a person is indebted to another, does not in and of itself render fraudulent that person's conveyance of property."). The fact finder must consider the totality of the circumstances surrounding a transfer, including any evidence negating intent. As the drafters of the UFTA noted: "In considering the factors listed in § 4(b) a court should evaluate all the relevant circumstances.... Thus the court may appropriately take into account all indicia negativing as well as suggesting fraud." Unif. Fraudulent Transfer Act § 4, cmt. 6.

In applying the "badges of fraud" identified in UFTA to the evidence submitted in this case, the Court finds the following:

### a. The transfer or obligation was to an insider.

The transfers of the Subject Parcels were made between a husband, the Debt-or, and wife, the Defendant. The Defendant meets the criteria of an insider.[10] Therefore, the Debtor's transfers were made to an insider.

### b. The debtor retained possession or control of the property transferred after the transfer.

The Plaintiff contends the Defendant did not demonstrate that she exercised any significant level of control over the Subject Parcels after the transfers and never had sufficient experience, training, or education to handle the subsequent sales of the Subject Parcels to third parties without receiving significant assistance from the Debtor. In contrast, the Defendant asserts the Debtor did not retain control.

The evidence established the Defendant was familiar with the properties transferred to her, attended all closings, and was generally familiar with the transactions in question. Furthermore, many of the properties were listed for sale before the 1999 transfers. Moreover, none of the properties were developed but were, instead, sold as undeveloped land in order to pay the Debtor's business debts and family expenses. While the Debtor may have counseled the Defendant in connection with the sales of the properties, the Plaintiff failed to establish the Debtor had control over the disposition of the properties after the transfers in question.

### c. The transfer or obligation was disclosed or concealed.

The evidence is clear the transfers were not concealed but were made in furtherance of estate planning. All of the deeds were properly recorded at the appropriate registry of deeds. Nevertheless, the Plaintiff contends the Defendant attempt-

10. An insider includes a "relative" of the debtor, NH RSA 545–A:1(VII)(a)(1), and the term relative is defined to include a spouse of the debtor, NH RSA 545–A:1(XI).

ed to conceal the subsequent proceeds from the sale of the Subject Parcels, because the Defendant deposited said in four different bank accounts, two of which were banks located outside of New Hampshire. The Defendant, however, asserted that her use of multiple bank accounts was not fraudulent because her goal was to simultaneously maintain a relationship with a local bank and receive the best possible interest rate.

The fact the Defendant had multiple bank accounts is unpersuasive. Even if the Defendant had deposited the proceeds of sales in accounts with banks located in New Hampshire, the Plaintiff failed to show that such accounts would have been easier to find than the accounts the Defendant used. Furthermore, the Plaintiff failed to show the Defendant had any obligation to disclose her banking relations to anyone at the time deposits were made into such accounts. In addition, the Defendant presented no evidence that the location of the accounts in any way resulted in concealment of their existence or use. Therefore, the Plaintiff failed to show the Defendant concealed the proceeds from the sales of the Subject Parcels.

### d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

While the Plaintiff agrees there were no pending suits against the Debtor at or prior to the June 1999 transfers, the Plaintiff points to the January 21, 1998, letter Citizens Bank sent to the Debtor indicat-ing Citizens Bank intended to commence foreclosure proceedings. (Trial Exhibit 5.) The Defendant disputes this assertion. In support of this argument, the Defendant points out that (1) at all times the Debtor disputed the note and (2) neither First NH nor Citizens Bank took any action to collect on the Note.

The Court notes that eighteen months separate the January 21, 1998, letter and the transfers of the properties. In addition, the evidence discloses that the Debtor and Citizens Bank disputed the amounts owed by the Debtor for a number of years, and the bank never instituted foreclosure proceedings or a court suit to collect the amounts it claimed were owed. The threats from the bank at and prior to the time of the transfers were neither immediate nor credible when viewed in light of the history of the communications between the Debtor and the bank prior to the transfers.[11] Therefore, for the "badges of fraud" assessment, the Debtor was not being threatened with a suit before the transfers were made.

### e. The transfer was of substantially all the debtor's assets.

The evidence establishes that the Debtor intended for the transfers to equalize the assets he and the Defendant held in order to reduce potential federal estate taxes, and that the transfers had this effect. After the transfers, the Debtor still held substantial assets. Therefore, the transfers were not of substantially all the Debtor's assets.

11. The Plaintiff places great emphasis on the state court finding, in 2001, that the Debtor was unreasonable in his belief that he was no longer liable on the Note. However, that finding reflects a legal conclusion by the state court that does not negate the history of communications between the Debtor and Citizens Bank prior to June 1999, nor is it helpful to the Plaintiff on the issue of the Debtor's intent at the time of the transfers. To the contrary, the Debtor's conduct in filing that suit and raising the issue of the discharge of his liability under the Note supports a finding that, at the time of the transfers of the Subject Parcels, the Debtor did not believe he had any material liability to the holder of the Note.

### f. The debtor absconded.

No evidence was presented on this factor.

### g. The debtor removed or concealed assets.

The Plaintiff has not presented any credible evidence the Debtor removed or concealed assets.

### h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

The Plaintiff contends, and the evidence is undisputed, no monetary consideration was paid for the Subject Parcels. Rather, the transfers were made for estate-planning purposes.

### i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

The financial affidavit prepared by the Debtor for estate-planning purposes indicates the Debtor's net worth was approximately $770,000.00 in early 1999. (Trial Exhibit 109.) The Plaintiff requests that the Court use a doctrine referred to as "retrojection" in order to establish the Debtor had a negative net worth of $1,330,153.12 (as stated on his bankruptcy petition) as of the date of the transfers. The Plaintiff contends the Debtor has admitted his financial condition did not materially change between 1999 and the commencement of his bankruptcy proceeding in the fall of 2001. The Plaintiff believes the doctrine of retrojection would establish that the Debtor became insolvent as a result of the transfers of the Subject Parcels. The Defendant contends that retrojection has only been used in section 548

actions and, even then, only in situations within a three-month window, not the two-and-one-half-year period in this case.

Insolvency is not always susceptible to direct proof and frequently must be determined by proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed. *Hassan v. Middlesex County Nat'l Bank*, 333 F.2d 838, 840 (1st Cir.1964) *quoting* 1 *Collier on Bankruptcy* 123 (14th ed.1962). When such a method is sought to be invoked, it is essential the trustee be able to show the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates. *Id.*

The evidence relating to the Debtor's solvency at the time of the transfers is scant. The Plaintiff offered the schedules filed with the Debtor's petition on October 15, 2001, which show his debts exceeded his assets on that date by approximately $1,330,153.12. The Defendant offered the Debtor's Estate Planning Questionnaire, where the Debtor fixed estimated values to his assets. (Trial Exhibit 109.) Although the Questionnaire is arguably a self-serving document, it was the only evidence presented regarding the value of the Subject Parcels and the Debtor's solvency at the time of the transfers. Furthermore, the Plaintiff did not produce any evidence to rebut the Debtor's testimony or the values in the Questionnaire.

Other than one general statement by the Debtor, the Plaintiff also failed to offer any evidence showing the Debtor's condition had not changed during the twenty-nine months between June 3, 1999, and October 15, 2001. The Debtor's general statement that his financial condition had not materially changed was contradicted by other, more specific, evidence. This evidence shows that between June 3, 1999, and Oc-

tober 15, 2001, the Debtor experienced numerous medical problems that prevented him from working, yet he continued to pay his obligations, with the exception of the Note. The Plaintiff did not offer any evidence to establish that the value of any of the Debtor's assets changed during the two-and-one-half-year period between the transfers and the petition date. Yet the evidence indicates otherwise. (Trial Exhibit 109 and the bankruptcy schedules.) The Court finds the paucity of evidence regarding values coupled with the extended period of time between the petition date and the date of the transfers renders the doctrine of retrojection unreliable, if applicable at all. In short, the Plaintiff did not present any reliable evidence sufficient to prove the transfers rendered the Debtor insolvent on June 3, 1999, under a preponderance of the evidence standard, let alone by clear and convincing evidence.

### j. The transfer occurred shortly before or after a substantial debt was incurred.

The undisputed evidence is that the Note was signed on August 22, 1990, nine years before the transfers. Therefore, the transfers did not occur shortly after a substantial debt was incurred.

### k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The Plaintiff does not allege the Defendant was a lienor of the Debtor at the time of the transfers.

### 4. Proof of Actual Fraud

Comment 5 to UFTA states: "Subsection (b) is a nonexclusive catalogue of factors appropriate for consideration by the court in determining whether the debtor had an actual intent to hinder, delay, or defraud one or more creditors. Proof of the existence of any one or more of the factors enumerated in subsection (b) may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer..." Unif. Fraudulent Transfer Act § 4, cmt. 5, 7A U.L.A. 654 (2004). Even more enlightening is Comment 6, which states in part: "In considering the factors listed in § 4(b) a court should evaluate all the relevant circumstances involving a challenged transfer or obligation. Thus the court may appropriately take into account all indicia negativing as well as those suggesting fraud." *Id.* at cmt. 6.

The Court finds the transfers of the Subject Parcels were for a legitimate purpose: estate planning. *See In re White*, 130 B.R. 979, 989 (Bankr.D.Mont.1991) (finding estate planning in the face of medical advice constitutes sufficient consideration to avoid being labeled as a badge of fraud). The estate plan was the result of the advice of specialized legal counsel contacted for that purpose. The timing was dictated by the Debtor's medical condition and the lengthy interval since the last estate planning. The Plaintiff presented no evidence that the nature of the controversy or the level of the dispute between Citizens Bank and the Debtor over his obligations under the Note was materially different immediately before the transfers than at any time during the preceding six years. Finally, the estate plan executed by the Debtor and the Defendant, in form and substance, was consistent with estate plans routinely followed by persons whose combined assets exceed the amount of property sheltered from federal estate taxation by the Unified Gift and Estate Tax Credit. Such plans are recommended by legal advisers and are entered into by

spouses to reduce the potential for federal estate taxes to shrink their combined estates and to avoid the publicity and expense of probate. The Plaintiff presented no evidence which leads the Court to conclude the actual intent of the Debtor and the Defendant, in executing their estate plan, was motivated by any different considerations. The Court further finds these legitimate purposes outweigh any of the indicia that suggest fraudulent intent. Accordingly, the Court finds the Plaintiff has failed to establish by a preponderance of the evidence, let alone clear and convincing evidence, that the Debtor transferred the Subject Parcels to the Defendant with actual intent to defraud creditors under section 4(I) of UFTA.

### 5. Constructive Fraud: NH RSA 545-A:4(I)(b)

Unlike actual fraud, constructive fraud is essentially unconcerned with intent and instead focuses upon economic effect. Constructive fraud has been defined as an "unintentional deception or misrepresentation that causes injury to another." *Black's Law Dictionary* 686 (8th ed.2004). UFTA requires creditors to prove both of two elements in order to prove a constructive fraud case:

1. The debtor transferred an asset or incurred a debt "without receiving a reasonably equivalent value in exchange for the transfer or obligation,"

2. "[A]nd the debtor" did either of the following:

 a. "[W]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or"

 b. "[I]ntended to incur, or believed or reasonably should have be-

lieved that he [or she] would incur, debts beyond his [or her] ability to pay as they became due."

NH RSA 545-A:4(I)(b). At the close of the Plaintiff's case, the Court granted the Defendant's motion to dismiss the Plaintiff's claim for constructive fraud based upon the second alternative element under NH RSA 545-A:4(I)(b)(2), incurring debts beyond the Debtor's ability to pay as they became due. Accordingly, the Plaintiff's claim for constructive fraud is limited to NH RSA 545-A:4(I)(b)(1), unreasonably small assets in relation to prospective business or transactions.

#### a. Reasonably equivalent value.

The evidence establishes, and the Defendant does not dispute, that no consideration was paid for the transfers of the Subject Parcels. Therefore, the first element of constructive fraud is established.

#### b. Engaging in business with unreasonably small capital.

The Debtor has engaged in the business of buying, selling, and developing real estate for the last thirty years. Since the early 1990s, it appears his activities were limited to the purchase and sale of unimproved real estate. His primary business assets were various parcels of investment real estate he owned and held for resale. The Plaintiff contends the Debtor transferred half of such business inventory to the Defendant for no monetary consideration leaving himself with capital that was unreasonably small to operate his real estate investment business. The Defendant argues this element does not apply because, due to the Debtor's medical condition, he was not engaged in any real estate development before or after the transfers.

The Debtor testified he was not engaged in any real estate activity following his surgery due to the numerous medical complications that arose from his hip surgery. However, the Debtor also testified that he sold three out of four lots located in Plymouth between the time he completed his estate-planning questionnaire in March 1999 and the time of the transfers of the Subject Parcels in June 1999. (Trial Exhibit 109.) The evidence demonstrates the Debtor was engaged in the real estate business immediately prior to the transfers, and there was no evidence the Debtor intended to cease such business activities immediately following the transfers.

The testimony of the Debtor and the Defendant establish that since the birth of their first child, the Defendant did not work outside the home. Her only income-producing activities over the past twenty or so years appear to have been discussing real estate matters with the Debtor and, after his health declined, accompanying him on site visits to the various parcels he owned. During this twenty-year period, the Debtor's real estate business was the sole source of support for the Debtor, the Defendant, and their family. No evidence was presented that reflected any intent on the part of the Debtor to cease such activities with respect to the sale of parcels he owned in early 1999. No evidence was presented as to how the Debtor could pay his business debts and support himself and his family without continuing to engage in the business of selling his real estate inventory. The Debtor may have intended to reduce his business activity, but he intended to continue to derive income, pay his business debts, and support his family from the sale of real estate inventory.

The following tabular summary of the evidence presented at trial shows the Debtor's real estate business assets immediately before and after the transfers of the Subject Parcels. All of the values are based upon the evidence presented at trial, primarily the Debtor's estate-planning questionnaire, Trial Exhibit 109, and the mortgages.

20

| Debtor's Business Assets[12] | | | | | |
|---|---|---|---|---|---|
| Property | Value | Liens | Equity | Retained by the Debtor | Transferred to the Defendant |
| 2.7 Acres in Ashland | $8,000 | $800,000 | ($566,000) | ($566,000) | |
| 15 Acres in Groton | $11,000 | * | * | | |
| 5.7 and 25 Acres in Plymouth | $165,000 | * | * | | |
| 26 Acres in Danbury | $50,000 | * | * | | |
| 5 Acres in Wentworth | $0 | $20,000 | ($20,000) | ($20,000) | |
| 6 Acres in Rumney | $27,000 | $40,000 | ($13,000) | ($13,000) | |
| Condo in Plymouth | $45,000 | $31,000 | $14,000 | | $14,000 |
| 11 Timeshares in Ashland | $22,000 | $0 | $22,000 | $22,000 | |
| 4 Lots in Plymouth | $120,000 | $53,000 | $67,000 | $37,000 | $30,000 |
| 14 Acres in Holderness | $45,000 | * | $45,000 | | $45,000 |
| 20 Lots in Campton | $240,000 | $35,000 | $205,000 | | $205,000 |
| 2 Lots in Hebron | $120,000 | $30,000 | $90,000 | $90,000 | |
| Apartment Building and Storefront in Ashland | $190,000 | $31,000 | $159,000 | | $159,000 |
| 318 Acres in Hebron and 1 Lot in Plymouth | $160,000 | $0 | $160,000 | $40,000 | $120,000 |
| 2.35 Acres in Hebron (Joint) | $12,500 | $0 | $12,500 | | $12,500 |
| | | | | | |
| Totals | $1,215,500 | $1,040,000 | $175,500 | ($410,000) | $585,500 |

Notes:

1) The Court used $800,000 as the amount due under the Note. Even though the Debtor did make one $20,000 payment, he did testify the payment would have been more than offset by accruing interest. The mortgage securing the $800,000 obligation included the first four properties listed above.

2) The "4 lots in Plymouth" and the "14 acres in Holderness" were all included in the mortgage securing the $53,000 obligation

3) The Court did not include the jointly owned timeshare in Cape Cod or the Washland Laundry business because there was no evidence these assets were intended to be sold for the production of income. The timeshare appears to have been intended for personal use and the laundry business was an operating business not held for immediate sale.

The evidence shows that immediately before the estate-planning transfers of the Subject Parcels the Debtor held real estate business assets worth $1,215,500.00 that were encumbered by $1,040,000.00 in mortgages, which left equity of $175,500.00. Although the Debtor had significant equity in his residence, as well as other assets, all of the property transferred to the Defendant as part of the estate-planning transfers were business assets. Furthermore, immediately after the transfers, the Debtor had negative equity of $410,000.00 in his business assets while the Defendant held former business assets of the Debtor with combined equity of $585,500.00.[13] Therefore, the estate-planning transfers resulted in the Debtor transferring to the Defendant all of his equity in his business assets.

12. The Debtor's one-half interest in his personal residence is not listed because the evidence reflects it was not held for the production of income and, therefore, is not considered a business asset.

13. The Debtor contends he thought he did not owe anything to Citizens Bank on the Note and, therefore, he did not intend to render his business holdings insolvent. However, the economic effect, not the Debtor's actual intent, is controlling for purposes of constructive fraud.

The evidence at trial demonstrated that since the transfers the Defendant sold nearly all of the Subject Parcels conveyed to her by the Debtor. Since the properties transferred to her consisted entirely of assets formerly held by the Debtor for sale in connection with his real estate business activities, the subsequent sales are probably not remarkable in and of themselves. An analysis of the evidence regarding the disposition of the proceeds from the sales of the Subject Parcels by the Defendant during the one-year period following the estate-planning transfers shows how most of those proceeds were used. Exhibit A to this opinion reflects the receipt and disposition of proceeds from the sale of the Subject Parcels for the period from the date of the estate-planning transfers to the date of the last sale (June 3, 1999 to December 4, 2002). Exhibit B contains a detailed list of the evidence presented on the sources and uses of the proceeds from the sales of the Subject Parcels. Based upon the evidence, the Court divided the proceeds into four categories as follows: first—transfers that solely benefited the Debtor; second—transfers to the joint checking account of the Debtor and the Defendant, which the evidence suggests represent funds used for the ordinary and necessary support of the Debtor and the Defendant; third—transfers that solely benefited the Defendant; and fourth—transfers where the party benefited cannot be determined. Finally, the results of the Court's analysis of the evidence were summarized to show the cumulative amounts of such benefits in two-month intervals over the year subsequent to the transfers of the Subject Parcels. That summary, set forth on the last page of Exhibit B, follows:

| | Benefit | | | |
| | Debtor | Joint | Defendant | Unknown |
|---|---|---|---|---|
| Totals | $230,673.81 | $94,695.52 | $57,315.93 | $56,530.00 |
| 2 months | $ 12,250.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| 4 months | $134,980.00 | $36,094.00 | $55,815.93 | $ 0.00 |
| 6 months | $164,980.00 | $55,686.82 | $55,815.93 | $ 0.00 |
| 7 months | $164,980.00 | $71,091.68 | $55,815.93 | $ 900.00 |
| 10 months | $180,043.81 | $81,488.72 | $55,815.93 | $ 5,030.00 |
| 12 Months | $230,673.81 | $94,695.52 | $57,315.93 | $56,530.00 |

The evidence indicates the Defendant sold one parcel just two months after the estate-planning transfers and that all of the gross proceeds, after paying settlement costs, were used to pay a business obligation of the Debtor. Subsequent sales proceeds were used in substantial part to either pay obligations of the Debtor or were deposited in the joint checking account to pay ordinary and necessary living expenses. For the preceding twenty years, those living expenses had been paid from the business income of the Debtor. Six months after the estate-planning transfers, two-thirds of the gross proceeds from the sale of the assets transferred to the Defendant by the Debtor for estate-planning purposes, or nearly $220,667.00, had been used to pay expenses formerly paid by the Debtor from his business income. Twelve months after the estate-planning transfers, nearly seventy percent of the gross proceeds from the sale of the Subject Parcels, or $474,500.00, had been used to pay the sole obligations of the Debtor (49%) or the living expenses of the Debtor and the Defendant (20%). The cumulative percentages from the analysis in Exhibit B are shown in the following table.

22

| | Cumulative Gross Sale Proceeds | To or For Debtor's Benefit | To or for Living Expenses | Total Percentage |
|---|---|---|---|---|
| Sales within 2 months | $ 12,500.00 | 98% | 0% | 98% |
| Sales within 4 months | $262,500.00 | 51% | 14% | 65% |
| Sales within 6 months | $347,500.00 | 47% | 16% | 63% |
| Sales within 8 months | $399,500.00 | 41% | 18% | 59% |
| Sales within 10 months | $474,500.00 | 38% | 17% | 55% |
| Sales within 12 months | $474,500.00 | 49% | 20% | 69% |

The above table summarizes the evidence presented at trial, which shows that in the months after the estate-planning transfers the Defendant sold most of the Subject Parcels and utilized more than two-thirds of the proceeds to pay the Debtor's sole business debts and the joint living expenses previously paid by the Debtor's business income. Such evidence demonstrates that after the estate-planning transfers, even though no actual fraudulent intent was proven, the Debtor's remaining assets were unreasonably small in relation to the business in which he was engaged prior to and after the transfers. Moreover, the remaining assets were insufficient to generate the income needed to pay his business debts and support his family. Furthermore, utilization of the proceeds from the sale of the Subject Parcels to pay the Debtor's obligations and the family's living expenses substantially eroded whatever federal estate tax benefits may have been derived from the original transfers.

Accordingly, the Plaintiff has established, by a preponderance of the evidence, that the estate-planning transfers were constructively fraudulent under UFTA as enacted at NH RSA 545–A:4(I)(b)(1).

### B. Fraudulent Transfers Under the Bankruptcy Code: 11 U.S.C. § 548

The Plaintiff also claims the Debtor made fraudulent transfers of the Subject Receivables in violation of section 548 of the Bankruptcy Code. "Section 548 ... allows the Trustee to avoid a transaction made within one year before the commencement of the bankruptcy case, that depletes the debtor's assets to the detriment of the bankruptcy estate. The statute recognizes as fraudulent those transfers made with actual intent to hinder, delay or defraud creditors, as well as those that are deemed to be constructively fraudulent, because they are made for less than reasonably equivalent value, when the debtor is, or is rendered, insolvent, undercapitalized, or unable to pay its debts as they become due." King et al., Collier on Bankruptcy ¶ 548.01 (15th rev. ed.1998); see also Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254 (1st Cir.1991) ("The transfer of any interest in the property of a debtor, within one year of the filing of a petition in bankruptcy, is voidable by the trustee in bankruptcy if the purpose of the transfer was to prevent creditors from obtaining satisfaction of their claims against the debtor by removing the property from their reach."). Section 548 of the Bankruptcy Code provides that a transfer of the debtor's interest in property may be avoided if the transfer was:

1. Made or incurred within one year prior to the filing of the bankruptcy petition; and

2. was made with actual intent to hinder, delay, or defraud any creditor; or

3. the debtor received less than reasonably equivalent value: and

a. the transfer was made while the debtor was insolvent; or

b. the property remaining with the debtor was an unreasonably small capital; or

c. the debtor would be unable to incur or pay debts as they became due.

*See* 11 U.S.C. § 548(a)(1)(A) and (B); *Schreiber v. Emerson (In re Emerson)*, 244 B.R. 1 (Bankr.D.N.H.1999).

## 1. Burden of Proof

■ In *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court held that evidentiary questions concerning the discharge of a debtor under section 523(a)(2)(A) must be governed by a preponderance of the evidence standard when actual fraud is alleged. Although the *Grogan* Court was not directly addressing transfer avoidance, most decisions since *Grogan* have held that the same rule governs in actions under section 548. *In re Model Imperial, Inc.*, 250 B.R. 776 (Bankr.S.D.Fla.2000); *In re Bennett Funding Group, Inc.*, 232 B.R. 565 (Bankr.N.D.N.Y.1999); *In re Wolcott*, 194 B.R. 477 (Bankr.D.Mont.1996); *In re Food & Fibre Protection, Ltd.*, 168 B.R. 408 (Bankr.D.Ariz.1994); *In re Sullivan*, 161 B.R. 776 (Bankr.N.D.Tex.1993). A minority of courts, however, have continued to adhere to the clear and convincing standard in section 548(a)(1)(A) cases without discussing or distinguishing *Grogan*. *In re Taylor*, 133 F.3d 1336 (10th Cir.1998) (noting the split of authority but finding no need to resolve it; evidence showed actual intent to defraud, even if clear and convincing standard applied), *cert. denied*, 525 U.S. 873, 119 S.Ct. 172, 142 L.Ed.2d 140

(1998); *In re McLaren*, 236 B.R. 882 (Bankr.D.N.D.1999); *In re Lease–A–Fleet, Inc.*, 155 B.R. 666 (Bankr.E.D.Pa.1993). The rationale in *Grogan* leads the Court to conclude the standard of proof required under section 548 is preponderance of the evidence.[14]

## 2. Actual Fraud under Section 548(a)(1)(A)

■ The Plaintiff contends the transfers of the Subject Receivables were done with actual intent to defraud the Debtor's creditors. However, the Plaintiff did not present any evidence which would establish actual fraud except in the context of the source of funds used by the Defendant to purchase the Subject Receivables from the Debtor. The Court finds such evidence is insufficient to meet the Plaintiff's burden of proof under section 548(a)(1)(A). Therefore, the Plaintiff has failed to establish that such transfers were made with actual intent to defraud creditors.

## 3. Constructive Fraud under Section 548(a)(1)(B)

■ "A transaction may be avoided as a constructively fraudulent transfer under federal bankruptcy law if it is proved that (1) the debtor had an interest in the property transferred; (2) the transfer occurred within one year of the petition date; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of it; and (4) the debtor received less than reasonably equivalent value in exchange for the transfer." *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Group, Inc.)*, 232 B.R. 565, 570 (Bankr. N.D.N.Y.1999). The Plaintiff contends the Defendant actually used the Debtor's

---

**14.** The Court rejects the Defendant's argument that the standard is clear and convincing evidence because the Defendant erroneously relied on a pre-*Grogan* case. *See* Defendant's Post-Trial Memorandum *citing In re Osbourne*, 124 B.R. 726 (Bankr. W.D.Ky.1989).

24

funds, obtained through various sales of the Subject Parcels,[15] to purchase the Subject Receivables and that the valuation of the underlying properties was out of date. The Defendant, on the other hand, asserts the Debtor received bids for the underlying properties and that those values were used to determine the consideration paid for the Subject Receivables sold to the Defendant. The Defendant also contends she used her own assets, a combination of insurance and home equity loans, to buy the Subject Receivables.

First, the Court notes the Plaintiff presented sufficient evidence to establish, by a preponderance of the evidence, the first three elements necessary to establish constructive fraud under section 548. The Defendant does not seriously contest those elements. Therefore, the only issue is whether the Plaintiff established a lack of reasonably equivalent value.

 The Plaintiff did not introduce any evidence contradicting the values placed on the Subject Receivables by the Debtor and the Defendant. Absent such evidence, and finding the testimony of the Debtor on valuation credible, the Court finds the consideration paid for the Subject Receivables to be reasonably equivalent value. However, even if reasonably equivalent value was paid by the Defendant, if she did not pay that consideration from her own funds but, instead, used proceeds from the fraudulently transferred Subject Parcels or other funds of the Debtor, then the payments would be a sham and would not constitute reasonably equivalent value.

 The Plaintiff did not offer sufficient testimony or exhibits from which the Court could trace the funds used to purchase the Subject Receivables. Accordingly, the Court must examine the evidence presented and draw whatever conclusions such an examination may show. Exhibit B shows the Debtor deposited $150,000.00 (the "Deposit") on May 10, 2000 into Defendant's SWJ Trust II account at the Community Guaranty Savings Bank (the "CSGB Account"). There was testimony that the funds used for the Deposit came from the proceeds of a home equity loan.[16] At the time of the Deposit, there was approximately $68,785.00 in the CSGB Account. Following the Deposit, the CSGB Account had an approximate balance of $218,785.00. On the same day as the Deposit, the Defendant wrote checks or withdrew the items listed in the table below.

| Date | Transaction | Deposits | Withdrawals |
|---|---|---|---|
| 36655 | Deposit—Home Equity Loan | $150,000.00 | |
| 36655 | Cashier Check—Used to open the Westland Account | | $98,788.14 |
| 36655 | Withdrawal—Repayment of Loan for Stan (cashier check) | | $50,630.00 |
| 36655 | Withdrawal—Use Unknown (cashier check) | | $20,000.00 |
| 36655 | Withdrawal—Use Unknown | | $17,500.00 |
| 36655 | Withdrawal—Use Unknown | | $14,000.00 |
| 36655 | Check # 115—Payee Unknown | | $ 1,500.00 |

15. This argument *is predicated on the Court* finding the Subject Parcels were fraudulently transferred, which the Court has found.

16. The Plaintiff argued that half of those funds were actually the Debtor's since the loan was in both of their names. However, the Court rejects this argument because the Defendant is jointly and severally liable on the loan.

It is clear the total transfers out of the CSGB account, in the amount of $202,418.14, greatly exceeded the Deposit. The Subject Receivables were purchased using funds from the Defendant's Westland Bank account (the "Westland Account"). Accordingly, if the $98,788.14 [17] used to open the Westland Account came from the Defendant's funds, including the proceeds of the home equity loan, then her payment of the consideration for the Subject Receivables would not be a sham.

The question for the Court is whether the Plaintiff has presented sufficient evidence to enable the Court to trace the source of funds in the Westland Account. The First Circuit has established the principles used for tracing of funds under similar circumstances. *See Connecticut Gen. Life Ins. v. Universal Ins. Co.*, 838 F.2d 612, 618 (1st Cir.1988) (tracing funds in a constructive trust). The Court shall use those principles in this case. Under the holding in *Connecticut*, the mere commingling of the Defendant's property with the proceeds of property fraudulently transferred by the Debtor is not sufficient to defeat tracing. *Id.* In such cases, courts use the "lowest intermediate balance test." *See, e.g., Schuyler v. Littlefield*, 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806 (1914); *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 724 (4th Cir. 1998); *Connecticut*, 838 F.2d at 619. In this case, the lowest intermediate balance test would require the Court to assume that a withdrawal from the CSGB Account would be considered to be the Defendant's funds first, thus maintaining as much of the fraudulently tainted proceeds as possible. *Dameron*, 155 F.3d at 724. This result is usually said to be based on the

general presumption that when an act could have been done with honest intent or dishonest intent, the Court will interpret it as if it was intended to be a lawful act unless evidence to the contrary is presented. Therefore, because the Court has found the Plaintiff failed to establish actual intent to defraud, the Court will presume the Defendant acted with honest intent.

Pursuant to the lowest intermediate balance test, if the balance in the CSGB Account immediately before the Deposit equaled or exceeded the balance after the withdrawals on May 10, 2000, then any tainted funds in that account would not be traced to the Westland Account. For purposes of discussion, the Court will assume the entire balance in the CSGB Account immediately before the Deposit ($68,785.00) was proceeds from Subject Parcels fraudulently transferred to the Defendant by the Debtor. The evidence shows one withdrawal was to or for the sole benefit of the Debtor ($50,630.00) and the balance in the CSGB Account, after the withdrawal used to open the Westland Account and other withdrawals on May 10, 2000, was $16,366.86. When the balance in the CSGB Account immediately before the Deposit is reduced by the payment made for the sole benefit of the Debtor on May 10, 2000, the result is $18,155.00 ($68,785.00 less $50,630.00), or $1,788.14 more than the balance actually on hand after the withdrawals on May 10, 2000.

As much as $1,788.14 of the proceeds of the fraudulently transferred Subject Parcels, therefore, may have been used to fund the Westland Account. However, "maybe" is not sufficient for the Court to

---

**17.** The Court is perplexed by the Defendant's choice of such an odd number—fourteen cents—to withdraw from her CSGB Account in order to open a new account, out of state, for the ostensible purpose of receiving more interest. No evidence was offered to explain how this amount was determined.

trace the proceeds of the fraudulently transferred Subject Parcels to the Westland Account and, thereby, to the funds used to purchase the Subject Receivables. The Plaintiff has not presented sufficient evidence from which the Court can determine that the funds in the Westland Account used to purchase the Subject Receivables were not the funds of the Defendant. Accordingly, the Plaintiff failed to establish that the transfers of the Subject Receivables to the Defendant by the Debtor were constructively fraudulent.

## IV. REMEDY

■ The Plaintiff is not entitled to any of the remedies provided in the Bankruptcy Code because he failed to establish that the transfers were fraudulent under section 548. Nonetheless, the Plaintiff did establish a claim for constructive fraud under section 544(b) of the Bankruptcy Code, which allows the trustee to succeed to the rights an unsecured creditor would have under applicable state law. King, et al., *Collier on Bankruptcy* ¶ 544.09[2] (15th rev. ed. 1998) ("Although federal law provides the trustee with the rights of an actual unsecured creditor, the extent of those rights is determined entirely by the applicable state or local law."). However, section 544(b) of the Bankruptcy Code does not provide the trustee with any greater rights of avoidance than a creditor would have under applicable state law.[18] *Id.* ¶ 544.09[3]. Therefore, because the Plaintiff prevailed under the constructive fraud provisions of UFTA, the Plaintiff is entitled to the remedy a creditor would be provided under New Hampshire law.

■ According to New Hampshire law, when there has been a fraudulent transfer, the creditor is entitled to either a reconveyance or "judgment for the value of the asset transferred." NH RSA 545–A:8(II). Since it appears that substantially all of the Subject Properties have been sold, the Court shall enter a judgment for the value of the Subject Parcels at the time of the transfers. Such a judgment may be entered (1) against the first transferee or the person for whose benefit the transfer was made, or (2) against any subsequent transferee other than a good faith transferee. NH RSA 545–A:8(II). The amount of the judgment, however, is "subject to adjustments as the equities may require." *Id.* § (III). The question then is what adjustments, if any, are equitable in this case. Specifically, the issue is whether the amount of the judgment should be reduced to the extent the Defendant used proceeds to pay the Debtor's business bills or pay ordinary and necessary family expenses.

**18.** Cases decided under the Fraudulent Conveyance Act, before UFTA was adopted, support this position. For example, in 1920 a district court stated:

It is well established that the effect of this section is to clothe the trustee with no new or additional right in the premises over that possessed by a creditor, but simply puts him in the shoes of the latter, and subject to the same limitations and disabilities that would have beset the creditor in the prosecution of the action on his own behalf; and the rights of the parties are to be determined, not by any provision of the Bankruptcy Act, but by the applicable principles of the common law, or the laws of the state in which the right of action may arise. In other words, the Bankruptcy Act merely permits the trustee to assert the rights which the creditor could assert but for the pendency of the bankruptcy proceedings, and if, for any reason arising under the laws of the state, the action could not be maintained by the creditor, the same disability will bar the trustee.

*Davis v. Willey*, 263 F. 588, 589 (N.D.Cal. 1920) (*citing Collier on Bankruptcy* (10th Ed.) 1042(f) and (g); *Holbrook v. International Trust Co.*, 220 Mass. 150, 107 N.E. 665 (1915); *Manning v. Evans* 156 F. 106 (D.N.J. 1907); *In re Mullen* 101 F. 413 (D.Mass. 1900)).

Generally, changes in the value of the transferred asset that occur after the transfer has taken place do not affect the amount of the creditor's recovery. Unif. Fraudulent Transfer Act § 8, cmt. 3, 7A U.L.A. 654 (2004) ("The premise of § 8(c) is that changes in value of the asset transferred that occur after the transfer should *ordinarily* not affect the amount of the creditor's recovery." (emphasis added)). However, cases decided under the Uniform Fraudulent Conveyances Act, which preceded UFTA, demonstrate that there are circumstances that require a departure from that measure of damages. *Id.* For this reason, section 8(c), which states that a judgment is "subject to adjustments as the equities may require," was added to UFTA to provide statutory authorization to make the equitable adjustments the courts had already been making. *Id.*

After section 8(c) was added to UFTA, most state fraudulent transfer statutes adopted similar language. For example, in 1988, NH RSA 545–A:8–Defenses, Liability, and Protection of Transferee, was added to New Hampshire's UFTA.[19] Even prior to the enactment of this provision, however, the New Hampshire courts had a long-standing tradition of making equitable adjustments to judgments when the fraudulent transfer finding was based on constructive fraud rather than actual fraud. For example, in *Janson v. Schier,* 117 N.H. 570, 375 A.2d 1159 (1977), the transferee was credited for payments made to benefit the property, where there was no finding of actual fraud. *Id.* at 572–73, 375 A.2d 1159, *citing* 60 A.L.R.2d 595,

627 (1958); 1 G. Glenn, *Fraudulent Conveyances and Preferences* 258 (1940) ("While there are jurisdictions that do not allow reimbursement for improvements, the majority do when the improvements have enhanced the value of the property. This is particularly true where, as here, the grantee was found *innocent of fraud.*") (emphasis added).

■ As *Janson* demonstrates, equitable adjustments are generally made to prevent the Plaintiff from receiving a windfall of the post-transfer costs incurred by the transferee to improve the property.[20] Equitable adjustments, however, are not limited solely to post-transfer improvements. *In re Black & White Cattle Co.,* 783 F.2d 1454, 1462 (9th Cir.1986), *citing In re Verco Indus.,* 704 F.2d 1134 (9th Cir.1983) ("[A] transferee of a constructively fraudulent conveyance ... can make a set-off claim against a bankrupt estate once he returns the property."). Instead, equity guards against windfalls in general. In this case, the Defendant used some of the proceeds from the sale of Subject Parcels to pay the Debtor's business expenses and the family expenses the Debtor had been solely responsible for covering for the prior two decades. This use of the proceeds for those specific purposes was the basis for the Court's finding that the transfer was constructively fraudulent. Furthermore, the Plaintiff has not challenged the reasonableness or necessity of these payments. Therefore, in the absence of any finding of actual fraud, it would be a windfall to the estate to allow the Plaintiff full

---

19. Section 545–A:8 reads: "If the judgment under subsection (b) is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustments as the equities may require." This language directly tracks section 8(c) of UFTA.

20. *Cf.* 11 U.S.C. § 550(e), which statutorily provides a good faith transferee a lien for improvements on property. As is the case with equitable adjustments allowed under section 8(c) of UFTA, section 550(e) is intended to prevent a windfall to the estate. King, et al., *Collier on Bankruptcy* ¶ 550.06 (15th rev. ed.1998).

28

recovery of all the proceeds from the sale of the Subject Parcels without making an equitable adjustment to account for the proceeds the Defendant used to pay the Debtor's bills and cover the family expenses. Accordingly, the Court determines that it is equitable under the facts of this case to credit the Defendant for the expenditures she made that the Debtor could have legitimately made if the constructively fraudulent transfers had not occurred. However, the adjustment will be strictly limited to these uses. Therefore, all proceeds that cannot be directly traced to paying the Debtor's business expenses or maintaining the family are recoverable by the estate.

Accordingly, for the reasons discussed in this opinion and based upon the evidence submitted at trial, the Plaintiff is entitled to judgment against the Defendant for the value of the assets fraudulently transferred, or $585,500.00.[21] Pursuant to NH RSA 545–A:8(III), this amount will be adjusted downward by the amount of proceeds utilized to pay business debts of the Debtor and the ordinary and necessary living expenses of his family, or $325,369.33.[22] This results in a net judgment of $260,130.67.

## V. CONCLUSION

The Court shall issue a separate judgment:

1. In favor of the Plaintiff against the Debtor based upon the transfers of the Subject Parcels to the Defendant being constructively fraudulent under 11 U.S.C. § 544(b) and NH RSA 545–A:(4)(I)(b)(1);

2. In favor of the Plaintiff against the Defendant, individually and as Trustee of SWJ Trust II, as transferee and beneficiary in the amount of $260,130.67;

3. In favor of the Plaintiff against the Son in the amount of $25,000.00; and

4. In favor of the Debtor and the Defendant against the Plaintiff for all claims based upon NH RSA 545–A:4(I)(a), NH RSA 545–A:4(I)(b)(2), and NH RSA 545–A:5.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate judgment consistent with this opinion.

ENTERED at Manchester, New Hampshire.

---

21. *See* section III.A.5.b of this Memorandum Opinion and the table on page 20.

22. *See* section III.A.5.b of this Memorandum Opinion and the table on page 22.

## Exhibit A - Timeline of Post-Estate Planning Transfers

| Date | Property | Gross Proceeds | Net Proceeds | Disposition of Proceeds | Exhibit # |
|---|---|---|---|---|---|
| 6/3/1999 | Estate Planning Consummated | | | | |
| 8/10/1999 | Campton, NH - 2 Acres (Lot 15) | $12,500.00 | ($917.81) | $12,250.00 toward a partial release/payoff of a Hope French Mortgage in Debtor's name. Testimony Day 1 - timestamp 11:36:00. | 125 |
| 10/21/1999 | Hebron, NH - 529 Acres | $250,000.00 | $228,093.93 | $228,076.60 opens SWJ Trust II account at CGSB (#2043685). Trial Exhibit 45. | 141 |
| 12/27/1999 | Campton, NH - 30.85 Acres (Lots 32-34) | $85,000.00 | $83,540.50 | $3,540.50 cash was deposited into CGSB (#2043685) and she kept the $80,000.00 mortgage receivable. | 134 |
| 1/20/2000 | Plymouth, NH (Unit E-6) | $52,000.00 | $20,271.06 | $29,686.60 paid off mortgage in Debtor's name. The rest was deposited into CGSB (#2043685). | 138 |
| 4/6/2000 | Campton, NH - 2.4 Acres (Lots 30 & 31) | $75,000.00 | $74,342.00 | Deposited into CGSB (#2043685) | 132 |
| 12/11/2000 | Campton, NH - 1.50 Acres (Lot 28) | $35,000.00 | $34,606.08 | Deposited into CGSB (#2043685). | 129 |
| 2/12/2001 | Campton, NH - 1.79 Acres (Lot 11) | $45,000.00 | $45,000.00 | Unknown | 24 |
| 7/13/2001 | Hebron, NH - 2.35 Acres (Lot 2) | $38,000.00 | $34,121.87 | Deposited into CGSB (#2043685). | 136 |
| 9/4/2001 | Plymouth (Reservoir Road) | $62,500.00 | $61,936.00 | Deposited into CGSB (#2043685). | 142 |
| 1/8/2002 | Campton, NH - 1.7 Acres (Lot 13) | $35,000.00 | $33,749.11 | Deposited into CGSB (#2043685). | 123 |
| 9/10/2002 | Campton, NH - 2.01 Acres (Lot 3) | $43,000.00 | $38,058.97 | Deposited into a different SWJ Trust II acount at CGSB (#2057875). | 120 |
| 12/4/2002 | Campton, NH - 1.5 Acres (Lot 27) | $45,000.00 | $38,716.65 | Deposited into a different SWJ Trust II acount at CGSB (#2057875). | 127 |

Total Gross Proceeds $778,000.00

Total Net Proceeds $691,518.36 Note: Includes the $80,000.00 mortgage.

## Exhibit B - Defendant's Use of Sale Proceeds

| Date | Description | Credit | Debit | Institution | Benefit | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Debtor | Joint | Defendant | Unknown |
| 6/3/1999 | Estate Planning | | | | | | | |
| 8/10/1999 | Sale of Campton, NH - 2 Acres (Lot 15) for $12,500 - $12,250 paid of a mortgage for Debtor, $917.81 for closing costs. | | $13,417.81 | | $12,250.00 | | | |
| 10/18/1999 | Closing Check from the sale of Hebron, NH - 529 Acres | $228,076.60 | | CGSB #2043685 | | | | |
| 10/21/1999 | Withdrawal - Deposited into Joint Account | | $36,094.00 | CGSB #2043685 | | $36,094.00 | | |
| 10/21/1999 | Check written to Northwestern Mutual Life (Day 1 - 01:38) | | $92,730.00 | CGSB #2043685 | $92,730.00 | | | |
| 10/25/1999 | Deposit - In Debtor's name | $15,600.00 | | CGSB #2043685 | | | | |
| 10/25/1999 | Check written to Paul Anderson Jr. (Day 1 - 01:39) | | $30,000.00 | CGSB #2043685 | $30,000.00 | | | |
| 10/26/1999 | Deposit - Source unknown | $23,750.53 | | CGSB #2043685 | | | | |
| 10/27/1999 | Check written to Relistar | | $55,815.93 | CGSB #2043685 | | | $55,815.93 | |
| 12/7/1999 | Check to a law firm (Day 1 - 01:40) | | $5,000.00 | CGSB #2043685 | $5,000.00 | | | |
| 12/10/1999 | Check to UNH for youngest son (Day 1 - 01:41) | | $3,646.00 | CGSB #2043685 | | $3,646.00 | | |
| 12/13/1999 | Transfer to Joint Account | | $8,000.00 | CGSB #2043685 | | $8,000.00 | | |
| 12/27/1999 | Deposit from the sale of Campton, NH - 30.85 Acres (Lots 32-34) | $3,540.50 | | CGSB #2043685 | | | | |
| | Private Mortgage on Campton, NH - 30.85 Acres (Lots 32-34) | $80,000.00 | | CGSB #2043685 | | | | |
| 12/29/1999 | Check written to Paul Anderson Jr. (Day 1 - 01:39) | | $25,000.00 | CGSB #2043685 | $25,000.00 | | | |
| 12/30/1999 | Check written to Town of Hebron | | $7,946.82 | CGSB #2043685 | | $7,946.82 | | |

| Date | Description | | | Account | | | |
|---|---|---|---|---|---|---|---|
| 1/3/2000 | Transfer to Joint Account | | $4,000.00 | CGSB #2043685 | | $4,000.00 | |
| 1/21/2000 | Deposit from the sale of Plymouth, NH (Unit E-6) | $20,271.06 | | CGSB #2043685 | | | |
| 1/22/2000 | Check written to Pendragon Real Estate (Day 1 - 01:33) | | $3,948.52 | CGSB #2043685 | | $3,948.52 | |
| 1/24/2000 | Check #105, payee unknown | | $900.00 | CGSB #2043685 | | | $900.00 |
| 2/2/2000 | Check written to Discover Platinum Card | | $3,507.82 | CGSB #2043685 | | $3,507.82 | |
| 2/19/2000 | Check written to Pendragon Real Estate | | $3,948.52 | CGSB #2043685 | | $3,948.52 | |
| 2/23/2000 | Deposit - Check In Debtor's name | $15,000.00 | | CGSB #2043685 | | | |
| 3/8/2000 | Phone Transfer (account unknown) | | $2,500.00 | CGSB #2043685 | | $2,500.00 | |
| 3/14/2000 | Check #110, payee unknown | | $2,200.00 | CGSB #2043685 | | | $2,200.00 |
| 3/20/2000 | Check written to Pendragon Real Estate | | $3,948.52 | CGSB #2043685 | | $3,948.52 | |
| 4/3/2000 | Deposit - Earnest money on the sale of Campton, NH - 2.4 Acres (Lots 30 & 31) | $10,000.00 | | CGSB #2043685 | | | |
| 4/3/2000 | Check written to Wells Fargo (Day 1 - 01:30) | | $15,063.81 | CGSB #2043685 | $15,063.81 | | |
| 4/5/2000 | Deposit - Source unknown | $333.13 | | CGSB #2043685 | | | |
| 4/7/2000 | Deposit - Sale of Campton, NH - 2.4 Acres (Lots 30 & 31) | $64,342.00 | | CGSB #2043685 | | | |
| 4/13/2000 | Check #113 - payee unknown | | $1,930.00 | CGSB #2043685 | | | $1,930.00 |
| 4/28/2000 | Check #114 - Land Lease Association (mortgage) | | $3,948.52 | CGSB #2043685 | | $3,948.52 | |
| 5/5/2000 | Phone Transfer (account unknown) | | $2,000.00 | CGSB #2043685 | | $2,000.00 | |
| 5/10/2000 | Deposit - Home Equity Loan | $150,000.00 | | CGSB #2043685 | | | |

32

| Date | Description | Amount | Account | | | | |
|---|---|---|---|---|---|---|---|
| 5/10/2000 | Cashier Check - Used to open the Westland Account | $98,788.14 | CGSB #2043685 | | | | |
| 5/10/2000 | Withdrawal - Cashier Check (repayment of loan for Debtor - Day 2 - 09:58) | $50,630.00 | CGSB #2043685 | $50,630.00 | | | |
| 5/10/2000 | Withdrawal - Use Unknown (cashier check) | $20,000.00 | CGSB #2043685 | | | | $20,000.00 |
| 5/10/2000 | Withdrawal - Use Unknown | $17,500.00 | CGSB #2043685 | | | | $17,500.00 |
| 5/10/2000 | Withdrawal - Use Unknown | $14,000.00 | CGSB #2043685 | | | | $14,000.00 |
| 5/10/2000 | Check #115 - payee unknown | $1,500.00 | CGSB #2043685 | | | $1,500.00 | |
| 5/23/2000 | Check #116 - Land Lease Association (mortgage) | $3,948.52 | CGSB #2043685 | | $3,948.52 | | |
| 5/24/2000 | Phone Transfer (account unknown) | $3,500.00 | CGSB #2043685 | | $3,500.00 | | |
| 5/31/2000 | Check written to Discover Platinum Card | $3,758.28 | CGSB #2043685 | | $3,758.28 | | |

| | Benefit | | | |
|---|---|---|---|---|
| | Debtor | Joint | Defendant | Unknown |
| **Totals** | $230,673.81 | $94,695.52 | $57,315.93 | $56,530.00 |
| 2 months | $12,250.00 | $0.00 | $0.00 | $0.00 |
| 4 months | $134,980.00 | $36,094.00 | $55,815.93 | $0.00 |
| 6 months | $164,980.00 | $55,686.82 | $55,815.93 | $0.00 |
| 7 months | $164,980.00 | $71,091.68 | $55,815.93 | $900.00 |
| 10 months | $180,043.81 | $81,488.72 | $55,815.93 | $5,030.00 |
| 12 Months | $230,673.81 | $94,695.52 | $57,315.93 | $56,530.00 |